## KEEN v. OVERSEAS TANKSHIP CORP.
### No. 97, Docket 22155.

United States Court of Appeals
Second Circuit.

Argued Dec. 4, 1951.

Decided Feb. 5, 1952.

Henry Fogler, New York City, for the appellant.

James F. Hart, New York City, Dorsey, Burke & Keber, New York City (Morgan J. Burke, Jr., New York City, of counsel), for defendant-appellee.

Before SWAN, Chief Judge, and L. HAND and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiff, Keen, a seaman on board the defendant's ship, "Meuse Argonne," appeals from a judgment entered upon the verdict of a jury against him, in an action to recover damages for personal injuries suffered in circumstances we shall state in a moment. As he did not ask for a directed verdict, the only questions open upon the appeal are the judge's rulings upon the admission of evidence, and his instructions to the jury. In order to understand the correctness of these it is necessary to state the facts in a little detail. Keen signed on as an A.B. and was part of the deck crew of the ship, a tanker. The second cook on board was named Mruczinski, and while the ship was in Manila, he and Keen went ashore on leave, and came back together on a launch. Mruczinski was drunk, as perhaps Keen was too; in any event the two got into a quarrel, either on the launch over Keen's supposed failure to pay Mruczinski a gambling debt, or over Mruczinski's lighting a cigarette after they had boarded the ship. In a scuffle which followed Keen knocked down Mruczinski with his fist. Mruczinski picked himself up, went to the galley, got hold of a meat cleaver, came back and from behind struck Keen a blow in the head, causing him serious injuries. Keen sued the defendant in a complaint in two counts, of which the second was for maintenance and cure, on which he obtained a judgment that is not before us. This appeal concerns only the verdict and judgment on the first count, which alleged (1) that the defendant was guilty of negligence in allowing a man of Mruczinski's known vicious proclivities to become a member of the crew, and (2) that the defendant was also liable because of the unseaworthiness of the ship, owing to Mruczinski having those proclivities. In his charge the judge told the jury that the first question they were to decide was whether the defendant had been negligent in failing to use proper care in signing Mruczinski on in the first place, and in keeping him on board after he had disclosed his violent nature. As to the unseaworthiness of the ship the charge was really no different, as appears from the following excerpt: the defendant "was under no duty * * * to inquire or examine into the physical or mental condition of a prospective employee," nor was it "an insurer" of his condition. If the cook was a man of "violent, vicious propensities" which "would constitute a menace," the defendant was bound to use care "to remove the peril,"

provided, however, that "the facts of his temperament were known, or should have been known" to the defendant.

■ If the plaintiff had excepted to this passage in the charge, we should not have hesitated to reverse the judgment, because, for reasons which will appear, we hold that it was not a correct statement of the law. It has long been settled that the assured's warranty of his ship's seaworthiness in a maritime policy is broken if the master or the crew are not competent for their duties. The King's Bench so held in 1811, Tait v. Levi, 14 East 481 (see also Walker v. Maitland, 5 B. & Ald. 172); the Supreme Court assumed as much in 1828, McLanahan v. Universal Insurance Company, 1 Pet. 170, 183, 7 L.Ed. 98; and the same doctrine lay behind the decision in Draper v. Commercial Insurance Company, 21 N.Y. 378. Moreover, in a suit by cargo against the ship *in rem,* Judge Betts in The Gentleman, Olcott, 110, Fed. Cas.No.5,324, made one ground of his decree in favor of the libellant that the crew were disabled by fever when the ship broke ground; and, although Mr. Justice Nelson, Fed.Cas.No.5,323, reversed this decree upon the facts, the whole discussion presupposed that, had the crew been in fact unfit for their duty, Judge Betts would have been right. The Ninth Circuit in Re Pacific Mail S. S. Co., 130 F. 76, 69 L.R.A. 71, held the shipowner liable without limitation for the loss of passengers' lives—and for the loss of life of one member of the crew—because the inability of the officers to communicate with a Chinese crew made the crew itself unfit for their duty and the ship unseaworthy. On the other hand, with the exception of the seaman just mentioned in Re Pacific Mail S. S. Co., supra, as to whom the court suggested no distinction, in none of the decisions we have mentioned did a member of the crew recover for personal injuries. In 1903 in the often cited case of The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760, the Supreme Court reviewed the law at length relating to an injured seaman's right against the owner; and held that he could not recover from the owner for injuries suffered through the negligence of another seaman, invoking the fellow servant doctrine of the common law; but it recognized that it was otherwise if his injuries arose from the unseaworthiness of the ship. In all the decisions which followed until 1924 the seaman had been injured by some defect in the ship's hull and gear, not because a fellow member of the crew had proved incompetent. However, in that year in The Rolph, 299 F. 52, the Ninth Circuit did allow recovery to a seaman for an assault by a particularly brutal and vicious mate. It based the recovery upon the unseaworthiness of the vessel, and declared (299 F. at page 55), that the ship was unseaworthy "where the mate [was] a man known to be of a most brutal and inhuman nature, one known to give vent to a wicked disposition" to assault sailors. It is certainly possible to read the decision, as the judge did in the case at bar, so as to limit the liability to situations where the owner knows that the seaman is unfit; and it is much more likely than not that the court so intended. However, in fact the owner did know the mate's brutal disposition, and that is all that the court had to decide. Moreover, even by way of dictum it did not say that the result would have been different if they had not had that knowledge. We do not take it as an authority for that proposition. Judge Patterson in The Magdapur, D.C., 3 F.Supp. 971, used language that made no distinction between seaworthiness in hull and gear and in personnel; any more than we did in Kable v. United States, 2 Cir., 169 F.2d 90, 92; but neither case is a holding on the point now before us. In Spellman v. American Barge Line Co., 176 F.2d 716, 721, one of the three grounds for the Third Circuit's reversal was that there was evidence from which the jury might find that the master was incompetent, which made the ship unseaworthy; and, although it did not appear that the incompetence was known to the owner, no such condition was imposed upon the new trial. Moreover, the master's incompetence was of a kind that it is scarcely conceivable that the owner should have known.

■ It must be owned that we have not found any decision which deliberately

decided that an owner is responsible for the seaworthiness of his ship in respect of personnel in the same sense that he is in respect of hull and gear; and, strictly, the point is *res integra*. Yet that seems to us to be a consequence of those decisions which have spoken of the crew's fitness as a condition of the ship's seaworthiness. It was law long before The Osceola, supra, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760, that the warranty of seaworthiness as to hull and gear ran as well in favor of seamen as of cargo or underwriters; and it is well settled that that warranty extends to unknown defects.[1] We can see no reason for saying that, although the owner is liable if the ship's plates are started without his knowledge, he is not liable if he signs on a homicidal paranoiac, whose appearance does not betray his disposition. The judge repudiated such a doctrine with vigor: "The American Merchant Marine could go fold up if we ever imposed an obligation of that sort on them." Apparently, he supposed that the choice lay between making the owner liable for every failure of a seaman to perform his duty, and exonerating him unless the owner had not used care in selecting the seaman. But there is no such dilemma, any more than there is as to failures in hull and gear. The warranty of seaworthiness as to hull and gear has never meant that the ship shall withstand every violence of wind and weather; all it means is that she shall be reasonably fit for the voyage in question.[2] Applied to a seaman, such a warranty is, not that the seaman is competent to meet all contingencies; but that he is equal in disposition and seamanship to the ordinary men in the calling. It is true that in two early cases judges certainly did use language which is counter to what we are holding. In The E. B. Ward, Jr., C.C., 20 F. 702, Judge Pardee said that an owner did not warrant the competency of his crew; and in Hurley v. The Lizzie Frank, D.C., 31 F. 477, 480, Judge Toulmin said that "seaworthiness includes a competent crew. Yet the owner does not *warrant* to each seaman the competency of the others." Conceivably all that each judge meant was what Judge Toulmin said: "There is no warranty that a crew shall not be negligent"; but, if the decisions must be deemed to hold that there is no warranty that the crew shall be reasonably fit for their duty, we cannot accept them as authoritative. As for the fears of the judge in the case at bar which we have just mentioned, we can see no antecedent reason to assume that after the owner has used due care in selecting the crew, they will in many instances turn out not to be up to the ordinary measure of the calling. But suppose there will be many such instances; that is no reason why an individual seaman who has suffered because his fellow is not up to his work, must bear the loss. Substantially all maritime risks are insured, and if we must suppose that the addition of this risk will show in the premiums, in the end it will be likely also to show in freight rates; and so far as it does, the recovery will be spread among those who use the ships. As we have said, this has been the uniform practise when the injury has arisen from defects in material; and we have yet to learn that hull and gear are less likely to fail under stress than those who handle both.

For the foregoing reasons we think that the judge misdirected the jury, but, since the plaintiff was content with the charge, we should not reverse the judgment, if there were nothing more in the record to justify doing so. There was. The plaintiff's effort throughout his case was to show that Mruczinski had been a drunken, dirty, quarrelsome seaman, who was

1. Work v. Leathers, 97 U.S. 379, 24 L.Ed. 1012; The Edwin I. Morrison, 153 U.S. 199, 210, 14 S.Ct. 823, 38 L.Ed. 688; Mahnich v. Southern S.S. Co., 321 U.S. 96, 100, 64 S.Ct. 455, 88 L.Ed. 561; The H. A. Scandrett, 2 Cir., 87 F.2d 708, 710; Balado v. Lykes Bros. S.S. Co., 2 Cir., 179 F.2d 943, 945.

2. Dupont de Nemours & Co. v. Vance, 19 How. 162, 167, 15 L.Ed. 584; The Silvia, 171 U.S. 462, 464, 19 S.Ct. 7, 43 L.Ed. 241; The Southwark, 191 U.S. 1, 9, 24 S.Ct. 1, 48 L.Ed. 65; Societa Anonima etc. v. Federal Insurance Co., 2 Cir., 62 F.2d 769, 771; Weil, Inc., v. American West African Line, 2 Cir., 147 F.2d 363, 365.

inherently dangerous and habitually had possession of deadly weapons. This line of inquiry the plaintiff tried to extend to showing that he was actually insane; and the evidence on that issue became entangled in the rules—some of them peculiar to the New York decisions—relating to the proof of insanity. Although the issue of insanity was relevant to Mruczinski's fitness, the plaintiff was of course limited to competent evidence; and, if nothing had appeared in the record beyond a few erroneous rulings on the competency of some of the evidence proffered, we should scarcely think it right to reverse. The situation was not so simple as that. After the plaintiff had labored for some time amid constant interruption to examine a witness, named Moore, the judge excused the jury and he and the two lawyers discussed the issue of Mruczinski's insanity. At the end of this talk the judge made it entirely clear that he did not think that Mruczinski's temperamental unfitness for his duty was a ground of liability unless it had come to the defendant's knowledge. His position was made plain at the conclusion of the colloquy, as appears in the appended addendum. It is indeed true that the plaintiff did not except to that ruling, any more than to the charge; but he had made his point clearly; the judge had overruled him; the defendant's attorney had said that the judge had anticipated the objection he himself was about to make; and these circumstances satisfied Rule 46, Fed.Rules Civ. Proc. 28 U.S.C.A. which preserves a point, if "a party * * * makes known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefor". Moreover, the plaintiff's failure later to repeat the objection, or to conform literally to Rule 51, was not a "waiver" of the ruling against him;[3] he had taken his position, had lost, and he was free thereafter to win a verdict if he could within the narrower borders of the case that the judge had laid down for him. Nothing goes further to disturb the proper atmosphere of a trial than reiterated insistence upon a position which the judge has once considered and decided. The notion is wholly untenable that in order to protect himself against an imputed surrender, a party must reassert what has been overruled every time the occasion comes up again.

Judgment reversed; new trial ordered.

### Addendum.

"Mr. Fogler: |Judge, what I had in mind was the famous Scandrett in (sic) the Smith v. Socony Vacuum, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265. In that case the Court held that where there is unseaworthiness regardless of principles of negligence or regardless of the fact that it places upon the shipowner the burden of an insurer, there is responsibility; and in this case, my contention in that respect for adducing that proof of insanity was that if they found the man was insane, liability followed from his acts regardless of whether they knew or didn't know.

"The Court: Well, Mr. Fogler, I think I have indicated that I don't agree with you at all on the fact, that on your cause of action for indemnity the shipowner is in the position of an insurer, because I recognize a distinction between the crew, the officers, a lawsuit involving a member of the crew, and that line of cases that have to do with lawsuits by passengers and freighters or cargo owners, and if you will read the Rolph case very carefully you will find implicit in that decision that distinction, and in fact it finally boils itself down to this very fundamental element. Of course, the Rolph case was handed down long before the Jones Act, 46 U.S.C.A. § 688, came into existence, but today, where a member of the crew brings an action, as I understand the law, from (sic) indemnity under the Maritime law, and for negligence under the Jones Act, his proof is the same; he must establish negligence, and I don't consider that those cases which deal with the rights of passengers and the rights of people who put cargo on board, as

---

3. Sweeney v. United Feature Syndicate, 2 Cir., 129 F.2d 904; Wright v. Farm Journal, 2 Cir., 158 F.2d 976; Williams v. Powers, 6 Cir., 135 F.2d 153, 156; Green v. Reading Co., 3 Cir., 183 F.2d 716, 719.

to the seaworthiness of the ship, that we can go that far on this definition of seaworthiness, when we are talking about a claim by a member of the crew for something done to him by another member of the unlicensed crew."