Raymond QUINTIN, Libelant,

v.

SPRAGUE STEAMSHIP COMPANY and
The Texas Company, Respondents.

United States District Court
S. D. New York.
Feb. 25, 1957.

Henry Fogler, New York City, for libelant.

Thacher, Proffitt, Prizer, Crawley & Wood, New York City, for respondent Sprague Steamship Co., Joseph M. Brush, Edward C. Kalaidjian, New York City, of counsel.

Tompkins, Boal & Tompkins, New York City, for respondent The Texas Co. Arthur M. Boal, New York City, of counsel.

McGOHEY, District Judge.

The libelant, a seaman, sues for damages and maintenance and cure on account of tuberculosis alleged to have been contracted and aggravated because of the negligence of Sprague Steamship Company and the unseaworthy condition of its and The Texas Company's vessels on which the libelant was employed.

Quintin's tuberculosis was discovered in July, 1951, while he was employed on The Texas Company's Minnesota. More than two years previous he had shared quarters on the Sprague Steamship Company's P. W. Sprague with one Sisko, from mid-December, 1948 until the end of May, 1949 when Sisko signed off the vessel. Six months later Sisko was found to have tuberculosis "moderately advanced." The argument in support of Quintin's claims runs thus. Sisko, while quartered with Quintin, knew or should have known that he was infected and was therefore under a duty to disclose this both to the libelant and the ship's officers so that he could be hospitalized or at least isolated, and thus prevent Quintin's infection. His failure to disclose was negligence of a fellow servant attributable to his employer, Sprague Steamship Company. As a result of this negligence Quintin became infected or, if he already had the disease, his infection was increased. Moreover, the infection was aggravated by the unseaworthiness of the P. W. Sprague in two respects: first, the inadequate ventilation and dampness of the quarters which Quintin and Sisko shared and in which they were required to stay when off watch during long periods at sea, when another member of the P. W. Sprague's crew had spells of violence, in one of which he killed the steward; second, the presence in her crew of a man infected with tuberculosis and a madman. Quintin's condition was further aggravated by unseaworthy, i. e. damp and ill-ventilated, quarters on the Sprague Steamship Company's Plymouth and the Minnesota on which he successively served after signing off the P. W. Sprague.

The facts found appear in the numbered paragraphs.

1. Sprague Steamship Co., a Maine corporation, owned, operated, managed and controlled two colliers: the P. W. Sprague, a Liberty ship, built in 1943 and converted to carry bulk cargoes; and the Plymouth, a bulk cargo carrier of the Seam class, constructed in 1945.

2. The Texas Company, a Delaware corporation, owned, operated, managed and controlled the Minnesota, a tanker of the T-2 class built during World War II.

3. Quintin is a citizen of the United States and a resident of Fall River, Mass. He was employed as a seaman aboard the P. W. Sprague from October 8, 1948 until July 26, 1949, when he signed off in order to take a vacation

ashore. He was then apparently in good health. Subsequently he served on the Plymouth from November 25, 1949 through August 7, 1950, when he again signed off in order to take a vacation ashore. He was then apparently in good health.

4. Each of these vessels, at the time Quintin joined it, was engaged in coastwise carriage of coal between Newport News, Va. and New England ports. Concededly at those times it was not customary to give pre-employment physical examinations to seamen signing on coastwise vessels, and Quintin was not examined.

5. Quintin was unmarried and, as far as appears, had no one depending on him for support at the times here material. Judged by his appearance and conduct on the stand, Quintin is quite above the average man of his calling. He is neat, alert and intelligent. His vacations, which he took regularly, were spent either at home in the winter or at vacation resorts in summer. Except during one voyage to Europe on the P. W. Sprague in May, 1949, he was in an American port each week during his service of more than nine months on the P. W. Sprague and eight and a half months on the Plymouth. He was free to sign off whenever the vessel was in port.

6. His next employment as a seaman was from early September through the end of December, 1950, on the S. S. Federal, which was not owned by either respondent and against which no claim is made here.

7. Quintin remained ashore from December, 1950 until February 4, 1951, when he signed on the Minnesota after passing a pre-employment physical examination. He continued to serve on her until July 13, 1951 when, while at work, he became ill and coughed up blood. The ship was then at San Pedro, California.

8. Prior to July 13, 1951, Quintin considered himself to be in good health. He did not complain but, on the contrary, stood his regular watches and worked substantial overtime on each of the vessels on which he served.

9. He was sent promptly from the Minnesota to the Public Health Service Clinic in San Pedro where X-ray examinations disclosed tubercular infiltration in the upper lobe of the right lung. He was transferred to the Marine Hospital at San Francisco on July 14, 1951. The history he there gave the admitting physician indicated to the latter, who so noted on the hospital record, that Quintin had been symptom-free until four days previously, except for a chronic cough which had been present during the previous two or three years and which Quintin said he believed to be due to smoking cigarettes. He remained at the hospital in San Francisco until September 12, 1951, when he was transferred to the United States Public Health Hospital, Manhattan Beach, N. Y. He remained there until April 29, 1952.

10. On the latter date he was transferred to the United States Marine Hospital, Stapleton, N. Y., where on June 9, 1952 the upper and middle lobes of the right lung were removed. On June 24, 1952, he underwent a right thoracoplasty.

11. He was returned to the Manhattan Beach Hospital on August 14, 1952, and remained there until discharged on February 18, 1953. Thereafter he received intermittent out-patient care until mid-September, 1953, when he was found "fit for duty."

12. On October 8, 1953 he signed on the S.S. New York Trader and worked on her until April 6, 1954. He was subsequently employed for a brief period aboard The Texas Company's tanker Connecticut.

13. From December, 1948 through May, 1949, Quintin shared quarters aboard the P. W. Sprague with two other members of the 4 to 8 watch, named Sisko and DeBartolo.

14. In 1941 Sisko had married one May Turner, with whom he had been acquainted for about a year. They lived together for only ten days thereafter,

when Sisko abandoned her and returned to sea. May Turner had been hospitalized for tuberculosis at the Fall River General Hospital between 1932 and 1936. At the time of her marriage to Sisko in 1941, she was an out-patient, her tuberculosis arrested. Three months later her tuberculosis was found active. She was readmitted to the hospital and was not discharged until 1943.

15. An X-ray of Sisko's lungs taken in October, 1945 during a pre-employment physical examination by a physician for the War Shipping Administration showed no evidence of tuberculosis.

16. Mrs. Sisko obtained a divorce in 1942. Early in 1946, during an attempted reconciliation, she shared the same room with Sisko at his parents' home for two nights. At that time her tuberculosis was arrested.

17. Sisko stood his watches regularly on the P. W. Sprague and appeared to other crew members and to his superior officer to be in good physical condition. He did not complain of illness and sought no medical care.

18. Sisko left the P. W. Sprague on May 30, 1949 and soon afterward joined the SS Diddo on which he served until some time in July, 1949 when after a pre-signing examination at Galveston he was rejected because of hernia. Whether the doctor then examined him for tuberculosis does not appear but, since it is most unlikely that this would have been omitted, I think it a rational inference and find accordingly that in July, 1949 the doctor found no evidence of the disease. In September, 1949 Sisko signed on the tanker Humphreys. In November, while still on that vessel, he complained of having a cold and was sent to the United States Public Health Service Hospital at Manhattan Beach where he was found to have tuberculosis, "moderately advanced." He remained there until discharged in January, 1952.

19. The room occupied by Quintin, Sisko and DeBartolo on the P. W. Sprague was located on the main deck starboard side of the midshipshouse. It was approximately 9 x 12 feet with a door, porthole, overhead mushroom-type ventilator and oscillating fan. It contained three bunks, three lockers and a washstand. Quintin and Sisko used the two lower bunks which were about four to five feet apart. DeBartolo used the single upper bunk.

20. In each week loading operations occupied about eighteen hours, and unloading two and a half to three days. During these periods and during heavy weather at sea, the ventilator outlet on deck was covered with canvas and the porthole was closed. At other times, as far as appears, the ventilator outlet was or could be uncovered. Neither the ventilator nor the porthole was mechanically defective. The room could also be ventilated even during loading and unloading operations by opening the door leading to the fore and aft inside alleyway and the door leading to the main deck on the lee side.

21. There were hairline cracks in the forward bulkhead plates of the P. W. Sprague's midshipshouse near the port and starboard corners close to the deck weld. These cracks were repaired on at least two occasions. In heavy weather at sea when the ship was loaded, some water seeped through the cracks into the boatswain's room on the starboard corner and the steward's on the port corner, and through the water-tight doors, into the alleyways. Water did not get into Quintin's quarters.

22. The vessel was inspected, and passed by the Coast Guard after an annual inspection conducted between May 31 and June 3, 1949. Commander Berg, who made the inspection, found the ventilation to be in compliance with regulations.

Quintin offered no technical evidence as to the ventilation. Testimony concerning the condition of Quintin's quarters came from himself, Sisko, DeBartolo, Bellevance the boatswain and Donovan the chief officer. Bellevance said "1,000 gallons a day" came in during heavy weather at sea and the men had "to bail day and night." Quintin said the ship "leaked like a sieve." These statements

were conceded by Quintin's proctor to be "exaggerations" which they obviously were, to say the least. Quintin nevertheless contends that his quarters were always damp and frequently had water on the deck so that he had to put his shoes on the bunk. Sisko agreed.

23. Sisko was unworthy of credence. I do not accept his testimony on any matter not otherwise proven.

Donovan and DeBartolo said some water came into the alleyways in heavy weather, but not into Quintin's quarters. DeBartolo said these were a little crowded, like those on other Liberty ships, but that they were all right and he had no complaint.

24. It is incredible that a man of Quintin's type, without dependents, would continue to sign on the vessel for every trip she made from October, 1948 through July, 1949 if the conditions on her were as bad as he now claims. I do not accept his testimony as to the condition of his quarters on the P. W. Sprague.

25. Quintin's quarters on the P. W. Sprague were not unseaworthy either on account of insufficient ventilation or dampness.

26. In May, 1949 the P. W. Sprague made a voyage to Europe. On her return voyage to Hampton Roads, Va., Piwaramus, a seaman, from time to time manifested symptoms of delirium tremens. The master confined him when he appeared disturbed and then released him to regular routine. When the vessel was about four days out, Piwaramus while free of restraint became violent, assaulted the steward with a knife and killed him. Piwaramus was promptly seized, and for the remaining nine days of the voyage was confined under guard and manacled to a bunk in the boatswain's room.

27. It is probable that the crew kept to their quarters with the doors closed and perhaps even barricaded at the time of the murder and until Piwaramus was secured under guard. DeBartolo lost no sleep except perhaps on the night of the murder and saw no evidence that Quintin was nervous after the incident. I do not accept Quintin's testimony that he kept the door to his quarters closed and barred at all times thereafter during the voyage and that he was unable to rest because of fear.

The warranty of seaworthiness applied to a seaman is that "he is equal in disposition and seamanship to the ordinary men in the calling." [1] And the question of his equality is to be "judged by the usual standards of the calling." [2] While heavy drinking on shore leave in foreign ports is a common enough practice of seamen and thus may be thought to be consistent with "the usual standards of the calling," brutal and murderous assaults on fellow seamen aboard ship are not consistent. [3] And the inconsistency can hardly be thought mitigated because the assailant is in a delirium brought on by indulgence in a practice common for men of his kind.

28. Accordingly, I find that on the voyage in question Piwaramus was not equal in disposition to the ordinary men of his calling and his presence in the crew breached the respondent Sprague's warranty of seaworthiness.

29. It is not claimed that Piwaramus assaulted or threatened Quintin and there was no credible evidence whatever that the presence of Piwaramus in the crew either caused or aggravated Quintin's disease.

30. On the Plymouth, Quintin shared quarters with two other seamen of whom one named Archibald testified. The room's dimensions were about 12 x 8 feet and it contained three bunks, three lockers and a washstand. There was a porthole, a ventilator and a fan. The door leading to the fore and aft alleyway had a louvered kickout panel.

1. Keen v. Overseas Tankship Corp., 2 Cir., 194 F.2d 515–518.

2. Jones v. Lykes Bros. Steamship Co., 2 Cir., 204 F.2d 815–817.

3. Keen v. Overseas Tankship Corp., supra.

31. During loading and discharging operations the ventilator was shut off and the porthole was closed. The room could be ventilated by opening the door to the alleyway and the door opening on deck on the lee side. Loading operations occurred during eighteen hours each week and unloading during two and a half to three days.

32. Quintin offered no technical evidence as to ventilation on the Plymouth. I do not accept Quintin's testimony that the ventilation on the vessel was inadequate. I do not believe he would have continued to sign on for every trip during eight and a half months if it were.

33. The quarters on the Plymouth were adequately ventilated, fit for their purpose and seaworthy.

34. On board the Minnesota Quintin shared quarters on the starboard side of the main deck, aft with three other men. The room was 12 x 17 and 8 feet in height. It had two portholes, a ventilator and a door with louvers for ventilation. Centrally heated air was circulated by fans into the crew's quarters.

35. In April, 1951 while in drydock the ship passed her annual Coast Guard inspection during which no repairs to the ventilating system were requested by the inspector, the union delegate or anyone else.

36. No such repairs were made.

37. Quintin with other members of the crew cleaned tanks in order to gas-free the ship prior to putting into drydock. There was no testimony that this customary work of seamen was done in other than the usual way.

38. Quintin's quarters on the Minnesota were adequately ventilated, fit for their purpose and seaworthy.

39. DeBartolo, who shared the quarters on the P. W. Sprague with Sisko and Quintin, did not contract tuberculosis.

40. Quintin again met Sisko while they were fellow patients in the hospital at Manhattan Beach, between September, 1951 when Quintin arrived there and January, 1952 when Sisko was discharged. Quintin, who then for the first time learned of Sisko's illness and his marital relations with May Turner and her medical history, commenced this suit in September, 1952.

41. Quintin, in July, 1945, took and passed a pre-employment physical examination. An X-ray picture of his lungs was then taken.

This was received in evidence and two medical experts with impressive qualifications called by the respondent Sprague said it showed evidence of tubercular infiltration at the apex of Quintin's right lung. One of these experts was Dr. Eglee, a man long recognized as an expert in the diagnosis and treatment of tuberculosis. He testified that this finding was entirely consistent with Quintin's history of steady work and apparent good health up to July, 1951. He said also that Sisko could not have been infected by his wife whose condition was arrested when he lived with her, and that Sisko did not have the disease while on the P. W. Sprague with Quintin; and that even if he were then infected, Quintin, being already infected, could not have become further infected by the association. Moreover, Dr. Eglee was of the opinion that Quintin's condition was not aggravated by the living or other conditions on the ships but rather by the fact that he was working at all, instead of getting the bed rest and care required to arrest and cure tuberculosis.

Quintin's doctor, also a man of long experience, disagreed. He was of the opinion that Sisko had probably been infected by his wife and in turn infected Quintin; and that the ventilation of the latter's quarters on the P. W. Sprague, the Plymouth and the Minnesota was inadequate, at least for a man with tuberculosis, and aggravated his condition. He also thought Quintin's 1945 X-ray picture, which was small, was not clear enough to justify the findings of Sprague's experts based on it. Quintin's proctor argues from this that Sprague's experts in effect recklessly charged the doctor who passed Quintin in 1945 with "malpractice." This, of

course, is nonsense. It is true that Quintin was passed at that time and again in February, 1951, although as far as appears no X-ray was taken at the latter examination. Sprague's experts' plausible explanation of these facts is that, not even experts rely on physical examination alone to detect evidence of tuberculosis and only those long experienced in interpreting X-ray pictures are competent to detect in them indicia of the disease in its early stages.

42. There was no evidence as to the experience of the doctors who examined Quintin in 1945 or 1951.

43. It is always a delicate matter for a layman to decide matters on which experts in the field are in sharp disagreement, and in this case there is no rational basis for me to prefer the opinion of Quintin's expert over the opinions of the two experts who testified to the contrary.

44. The credible evidence shows that Sisko did not think he had tuberculosis during the time he shared quarters with Quintin on the P. W. Sprague. In view of the sharp disagreement between the experts on the point, it would be to the last degree irrational to find that Sisko "knew or should have known" of his possible infection by his wife.

45. There was no proof whatever that Sisko had tuberculosis while he roomed with Quintin or that he knew or supposed that he had been exposed to infection.

46. Sisko was not negligent in failing to report to Sprague that he was infected or that he had been exposed to infection.

47. Sprague was not negligent in permitting Quintin to share quarters with Sisko.

In view of these findings, it is unnecessary to consider whether, as Quintin contends, a ship's warranty of seaworthiness is breached by the presence in the crew of a seaman infected with tuberculosis.

The respondent Sprague pleaded the Jones Act statute of limitations, 46 U.S. C.A. § 688, as a defense to the claim against it for damages. It contended also that the claim for indemnity under the general maritime law was barred by laches. The case having been fully tried, it was thought fairer and more appropriate to consider and decide Quintin's claims on the merits. These claims, as the findings show, Quintin has failed to sustain. It is unnecessary therefore to consider whether they were in any event time barred.

Conclusions

1. The Court has jurisdiction of the parties and subject matter.

2. The libelant has failed to prove that he contracted tuberculosis in the course of his employment aboard the P. W. Sprague or the Plymouth, or that any pre-existing infection was aggravated by the living or other conditions on either of those vessels.

3. While the libelant concededly fell ill with tuberculosis while serving on the Minnesota, he has failed to prove that this was due either to the negligence of the owner or the unseaworthiness of the vessel.

4. The Texas Company is liable to the libelant for maintenance and cure from the date of libelant's discharge to out-patient status in February, 1953 until he was found "fit for duty" in September, 1953, at the then prevailing rate.

A proposed decree in accordance herewith may be submitted on notice.