**Antonio NUZZO, Plaintiff-Appellee,**

v.

**REDERI, A/S WALLENCO, STOCK-
HOLM, SWEDEN, Defendant-
Appellant,**

**REDERI A/B SOYA, Defendant and
Third-Party Plaintiff-Appellant,**

v.

**PITTSTON STEVEDORING CORPORA-
TION, Third-Party Defendant-
Appellee.**

No. 48, Docket 26992.

United States Court of Appeals
Second Circuit.

Argued Oct. 31, 1961.

Decided May 14, 1962.

Submitted May 29, 1962.

Petition for Rehearing In Banc Denied
June 26, 1962.

William P. Kain, Jr., New York City (Haight, Gardner, Poor & Havens, and Thomas F. Molanphy, New York City, on the brief), for defendant and third-party plaintiff-appellant.

Frank A. Teti, New York City (Santo R. Sgarlato, Jr., Brooklyn, N. Y., on the brief), for plaintiff-appellee.

Thomas H. Healey, New York City (Monica & Feury, New York City, on the brief), for third-party defendant-appellee.

Before CLARK, HINCKS and FRIENDLY, Circuit Judges.

HINCKS, Circuit Judge.

Antonio Nuzzo, a longshoreman, brought this action against Rederi, A/S Wallenco, for injuries he received while unloading lumber from defendant's ship "Boheme" in New York Harbor. The undisputed testimony is that Nuzzo and three others were working in a deep

tank containing only lumber. The lumber had been loaded on the West Coast and, as is the practice, it had been originally stowed in a series of "false decks." Boards or planks were laid flat on the hold bottom lengthwise, that is to say parallel with the longitudinal axis of the hold, forming a "floor"; on top of that floor another was laid, and so on until the hold was filled. The boards varied in length, from six to twenty feet, and were mixed in other dimensions as well; there were 1 x 4's, 1 x 6's, 2 x 4's, and 2 x 6's. They were tied in bundles, however, apparently of equal thickness; and these bundles were stowed so as to form the successive floors.

The fore and aft bulkheads of the tank were vertically corrugated, for strength and rigidity. Their vertical ribs were about 10 inches apart and about 10 inches thick so that each pair of ribs enclosed on three sides a space of approximately 10" x 10" x 10" and the fourth or open side of this space was about 15". The deep tank itself was 34 feet long and 28 feet wide. The hatch opening in the deck above the tank—through which, of course, the cargo must be loaded and unloaded—was 15 feet by 12 feet, and roughly in the center of the tank.

In unloading, the stowage process was reversed. Slings were lowered into the tank. The longshoremen would fill these slings, which were then raised to the deck, emptied, and lowered again. The longshoremen would first clear out a working space directly under the hatch; this space would be roughly "man height" deep. They would then "go into the wings," that is, unload the lumber, above the level of that on which they were standing, to each side and fore and aft of the hatch. They would then successively repeat the process by removing the lumber in the center of the tank, directly under the hatch, and from this lower floor level again work out into the wings.

■ At a trial on issues of negligence and unseaworthiness, Nuzzo and his co-workers testified that they had gone down to man height and were working out into the wings. As Nuzzo stepped back to maneuver a bundle into position on the slings, he stepped into an empty space between the vertical ribs of the bulkhead which was "about 18 inches across and about two feet in depth," as found by the district judge.[1] He was thrown off balance and fell backward against the bulkhead, injuring his shoulders and back. His most substantial claim was that the void space was a dangerous and unseaworthy condition within the meaning of Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). His claim of negligence was dismissed by the court for lack of evidence—a ruling not challenged by appeal.

On the issue of unseaworthiness, the trial judge, in order to expeditiously dispose of the case, made his controlling rulings from the bench at the conclusion of the case without filing any written findings or conclusions. In his colloquy with counsel he said: "The case comes down to simply whether or not you made out a case of improper stowage, and that is at the port of loading, the loading port." And later he said: "The sole question in this case is whether or not the shipowner * * * provided a seaworthy vessel. * * * In that regard, the Court finds the issues in favor of the plaintiff against the defendant * * *." The only finding of fact bearing on that issue, to which the court gave expression, was that the claimant while "reaching * * * about head high to take off the bundles from the wing in the hold, and his back being to the bulkhead or the wall, which was corrugated

---

1. Neither from the evidence nor from the meagre findings which were expressed only orally from the bench at the close of the trial, is it possible to determine whether the empty space was wholly between the vertical ribs of the bulkhead or extended slightly further into the interior of the hold. However, any uncertainty on this point lacks significance, since it is agreed that the empty space was adjacent to the perimeter of the bulkhead.

in shape, stepped backwards slightly, and in doing so stepped into a hole about 18 inches across and about two feet in depth. He fell backwards and struck his right shoulder against the corrugated wall of the bulkhead * * *."

To test the validity of the conclusion reached we turn to the evidence. In addition to the undisputed evidence recited above there was the following. Bluni, a fellow longshoreman working with the plaintiff at the time, said that he saw the hole before the plaintiff's fall; that it had not been filled with dunnage but had been covered by a layer or floor of lumber until not more than fifteen minutes before the accident happened; that some of the lumber went "flat up against the bulkhead" and "sometimes it is short"; that "sometimes they put the top board against it, they cover it up with the hole"; and "the hole is supposed to be covered."

Durante, another longshoreman, testified for the plaintiff that after fifteen years experience in unloading lumber, the only hole he saw was the hole into which the plaintiff fell; that this hole had been "covered until we dug out the stuff that had to be out"; that "we always find holes. We always find holes if it is not properly stored." At this point, defendant's counsel contended that the witness did not qualify as an expert on the subject of stowage and unsuccessfully objected to his opinion that "holes" always were found "if it is not properly stored." However, in responding on cross-examination to the question, "It was a good lumber stow, wasn't it? But you saw it?" Durante testified: "Yes, I could say that."

The plaintiff himself testified that he worked at unloading similar lumber from similar ships since 1953; that on the day of the accident he had worked from 8 a. m. to 5 p. m. when he fell into a hole between the cargo and the bulkhead; that the hole into which he fell was the only one he had seen; and to the question, "Up to the time that you say you fell, Mr. Nuzzo, the lumber had been stowed properly, hadn't it?" he answered "Yes."

A careful reading of the transcript discloses no other evidence to support the plaintiff's case on the issue of unseaworthiness. And what appears is not enough, we think, to support the conclusion of unseaworthiness. In so holding we do not disagree with the learned trial judge that improper stowage may constitute a breach of the warranty of seaworthiness. That stowage, as well as hull and gear, is within the ambit of the warranty is well recognized in this circuit. Palazzolo v. Pan-Atlantic S.S. Corp. (Pan-Atlantic S.S. Corp. v. Ryan Stevedoring Co.), 2 Cir., 211 F.2d 277, affirmed as to the liability over of the stevedore in Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133; Rich v. Ellerman & Bucknall S.S. Co., 2 Cir., 278 F.2d 704; cf. Grillea v. United States, 2 Cir., 229 F.2d 687, rehearing 2 Cir., 232 F.2d 919. See also Gindville v. American-Hawaiian Steamship Co., 3 Cir., 224 F.2d 746.

Nor does our holding rest upon the fact that the hole into which the plaintiff stepped had been uncovered by the plaintiff himself and his "partner" but a few minutes before. That a longshoreman may recover for injuries resulting from unseaworthiness caused by himself or his fellows has been the law of this circuit at least since Grillea v. United States, supra.

Our holding rather is that there was neither finding nor proof of facts upon which the conclusion of unseaworthiness could properly be based. The mere fact that there was at a point in the perimeter a small empty space extending two feet below the adjacent "floor" of boards was not enough by itself, as we read Mitchell v. Trawler Racer, supra, to violate the standard of reasonable fitness prescribed by that opinion. Just as the owner was under "a duty only to furnish a vessel and appurtenances reasonably fit for their in-

tended use," as was said in Mitchell, so the owner's duty, with respect to the stowage of the ship, is only to furnish a stowage reasonably fit for its intended purpose. The purpose of stowage, of course, is a disposition of cargo within the vessel which will be reasonably safe and convenient both for carriage at sea and for unloading at the destination. The fact here that lumber of assorted sizes was to be fitted into a hold of fixed size made it likely, indeed inevitable, that here and there would be gaps or holes at the ends of the bundles. And that, so far as appears, none of these holes between bundles existed under the hatch where the longshoremen were continuously working, but only at the perimeter of the hold between the bundles and the bulkhead where they had little occasion to be, was a fact obviously adding to the reasonable fitness of the stow. Especially in the absence of evidence that this peripheral cavity was obscured by inadequate lighting we find no basis for holding that the stow was unseaworthy. Certainly we are referred to no cases in which unseaworthiness is based solely upon lack of a precisely fitted "wall-to-wall" stow of the successive floors of a lumber cargo.

The problem which faces us as to the applicable standard of seaworthiness is framed by the final passage from the court's opinion in Mitchell v. Trawler Racer, Inc., supra, 362 U.S. at 550, 80 S.Ct. at 933, where the court, in speaking of its decisions over the last 15 years, said:

" * * * What has evolved is a complete divorcement of unseaworthiness liability from concepts of negligence. To hold otherwise now would be to erase more than just a page of history.

"What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness;

not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service. Boudoin v. Lykes Bros. S.S. Co., 348 U.S. 336 [75 S.Ct. 382, 99 L.Ed. 354]."

More specifically, the problem is a determination of "reasonable fitness" of stowage which shall be consistent with the admonition to maintain "a complete divorcement of unseaworthiness liability from concepts of negligence."

We think the clue to the solution is to be found in the cited reference to Boudoin v. Lykes Bros. S.S. Co. In that case, the court gives approval to Judge Learned Hand's language and reasoning in Keen v. Overseas Tankship Corp., 2 Cir., 194 F.2d 515, which was a case involving a charge of unseaworthiness because in its crew was a seaman with a proclivity for assault. Judge Hand there had said: "Applied to a seaman, such a warranty is, not that the seaman is competent to meet all contingencies; but that he is equal in disposition and seamanship to the ordinary men in the calling." 194 F.2d at 518. This test was quoted by Justice Douglas in the opinion in Boudoin. He there further (348 U.S. p. 339, 75 S.Ct. p. 384) said:

"We see no reason to draw a line between the ship and the gear on the one hand and the ship's personnel on the other. A seaman with a proclivity for assaulting people may, indeed, be a more deadly risk than a rope with a weak strand or a hull with a latent defect. The problem, as with many aspects of the law, is one of degree. *Was the assault within the usual and customary standards of the calling?* Or is it a case of a seaman with a wicked disposition, a propensity to evil conduct, a savage and vicious nature? If it is the former, it is one of the risks of the sea that every crew takes. If the seaman has a savage and vicious nature, then the ship becomes a perilous place." (Emphasis supplied.)

Thus the test approved was essentially pragmatical. We applied a similar test in Poignant v. United States, 2 Cir., 225 F.2d 595, when we remanded for retrial on the issue of whether the vessel had been provided with the equipment usually found in similar vessels. And in other of our decisions affirming a finding of unseaworthiness there was direct evidence as to the pertinent "usual and customary standards." Cf. Rich v. Ellerman & Bucknall S.S..Co., supra; Reddick v. McAllister Lighterage Line, Inc., 2 Cir., 258 F.2d 297, cert. denied, 358 U.S. 908, 79 S.Ct. 235, 3 L.Ed.2d 229; Palazzolo v. Pan-Atlantic S.S. Corp., supra. And see Martin v. United Fruit Co., 2 Cir., 272 F.2d 347; Fatovic v. Nederlandsch-Ameridaansche Stoomvaart, Maatschappij, 2 Cir., 275 F.2d 188; Salem v. United States Lines Co., 2 Cir., 293 F.2d 121, cert. granted, 368 U.S. 811, 82 S.Ct. 62, 7 L.Ed.2d 21. But see Troupe v. Chicago, D. & G. Bay Transit Co., 2 Cir., 234 F.2d 253, 260.

There are doubtless many cases in which the condition causing the injury was so unusual or, because of some hidden or unapparent defect, so clearly dangerous as to warrant the conclusion of unseaworthiness by the trier, even in the absence of direct evidence that it was not "within the usual and customary standards" of comparable maritime activity. Cf. Van Carpals v. S.S. American Harvester, 2 Cir., 297 F.2d 9, cert. denied U. S. Lines Co. v. Van Carpals, 1962, 82 S.Ct. 1031; Grillea v. United States, supra. See also Gindville v. American-Hawaiian Steamship Co., supra.[2] It is true that in The T. J. Hooper, 2 Cir., 60 F.2d 737, cert. denied Eastern Transp. Co. v. Northern Barge Corp., 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571, it was held that the absence of a pertinent prevailing usage or custom will not necessarily preclude a finding of unseaworthiness. But this case, it will be remembered, was decided long before the Boudoin and Mitchell cases. Its opinion

speaks (60 F.2d p. 740) of "diligence" and "prudence." Its citations, e. g., Wabash Railway Co. v. McDaniels, 107 U.S. 454, 2 S.Ct. 932, 27 L.Ed. 605, make it clear that it was predicated on concepts of negligence which in Boudoin and Mitchell we are admonished to abjure. Whether its holding and dicta survive these recent holdings of the Supreme Court is unclear. However that may be, from a holding that unseaworthiness results from the absence of a working radio to receive weather reports on a seagoing tug, as in The T. J. Hooper, it does not follow that unseaworthiness results from lack of an unbroken wall-to-wall flooring at each successive level in a lumber stow.

■ Here, there was no concealed defect, indeed no condition, unusual in a lumber stow, which, because of its propensity to cause injury, was *obviously* at variance with general maritime practice. The problem here, as was said of the problem in Boudoin v. Lykes Bros. S.S. Co., supra, 348 U.S. p. 340, 75 S.Ct. p. 385, was "one of degree"; it was whether the stow was "within the usual and customary standards of the calling." As to that the judge made no finding. He found only that the plaintiff "stepped backward slightly, and in doing so stepped into a hole about 18 inches across and about two feet in depth. He fell backward and struck his right shoulder against the corrugated * * * bulkhead." For lack of a finding that such a hole in a lumber stow was at odds with the "usual and customary standards of the calling," we must hold the conclusion of unseaworthiness erroneous, and reverse. And since we find insufficient evidence to support such a finding if it had been made we remand with a direction to dismiss.

■ The absence of more complete findings makes it impossible for us precisely to locate our point of divergence from the holding of the learned judge

---

2. In this case, even though the stow was such that unloading was obviously dangerous, there was expert evidence to support the plaintiff's verdict. 224 F.2d 746, 748.

below. It is plausible to believe, however, that, being without benefit of a transcript when he made his rulings, he may have been misled by plaintiff's counsel who on final argument repeatedly asserted that the defendant-shipowner's own expert witness had testified that the gap or hole into which the plaintiff had stepped "was a dangerous condition" making the stowage unseaworthy.[3] Such, however, was not the expert's testimony. He plainly expressed the belief that in the stowage of lumber such holes are "the customary condition on every ship in the world," that he "wouldn't consider it dangerous"; that he had never seen such holes blocked up on a lumber ship. Of course the trial judge was not obliged to accept the expert's testimony. But if, as urged by plaintiff's counsel, he took the testimony as evidence of an unseaworthy stow *of lumber,* the transcript shows he fell into error.

Our decision,[4] we note, is broadly in line with several recent cases in this circuit holding that merely because of an accident aboard, the ship is not necessarily unseaworthy. Ezekiel v. Volusia Steamship Co., 2 Cir., 297 F.2d 215; Pinto v. States Marine Corp., 2 Cir., 296 F.2d 1, cert. denied, 82 S.Ct. 874 (1962); Puddu v. Royal Netherlands Steamship Co., 2 Cir., 303 F.2d 752 (January 3, 1962), rehearing in banc denied February 20, 1962, granted April

9, 1962, affirmed May 15, 1962; Richter v. Mathiasen's Tanker Industries, Inc., 2 Cir., 297 F.2d 494; Hooper v. Terminal Steamship Co., 2 Cir., 296 F.2d 281; Salem v. United States Lines Co., supra.

Reversed and remanded with a direction to dismiss.

CLARK, Circuit Judge (dissenting).

This case seems to me a clear case for affirmance. It was well tried by one of the most distinguished of American judges, long experienced in trial work, Chief Judge Murrah of the Tenth Circuit, sitting by designation below. His findings and conclusion of unseaworthiness of the ship by reason of the open holes left in the stowage of the lumber are well supported in the record and indeed seem rather inevitable. Some carping is had as to the "meagre" character of the findings. But findings should be geared to reflect the case as the judge saw it, not to some artificial standard of needless perfection; those made here do this perfectly and are more than adequate to set forth the simple and stark fact, actually recited three times in the opinion, that the plaintiff, while engaged in his task of unloading the lumber, stepped backwards and in doing so stepped into a hole "about 18 inches across and about two feet in depth." I do not wonder that this impressed my brothers so that they felt impelled thus

3. Counsel apparently had in mind the witness Keeler, an officer of high executive position in a large stevedore company who had worked his way up from the bottom of the business. Keeler, it is true, had testified to "a custom in the Port of New York and in other ports * * * with respect to the coverage of *these* holes" whereby "the covering of the holes is taken care of by the discharging stevedore" who has the "responsibility to see that the holes or whatever is uncovered by the men working in it * * * are covered *sufficiently to make it seaworthy,* to continue to work in that compartment." (Emphasis supplied.) But the context makes it plain by reference to the prior question (which had just been repeated) that the inquiry was as to a custom with respect to the coverage of *these holes* "in the carriage of other *types of cargo,* cases, bales, bags, for there to be spaces in the stow." (Emphasis supplied.) Indeed, plaintiff's counsel had objected to the question because it was not confined to the stowage of lumber. The expert's testimony, therefore, of a custom or responsibility for covering holes "sufficiently to make it (the stowage) seaworthy" was not only so vague as to be meaningless but did not even apply to lumber cargoes.

4. The defendant-shipowner by third-party complaint had sought to recover over from the stevedoring company any recovery by the plaintiff. The appeal covered also the ruling below dismissing the action over. Our disposition of the *plaintiff's* claim against the owner makes it unnecessary to pass upon the dismissal of the action over.

to reiterate it. But I do not understand why they draw back from the necessary conclusion.

For this would seem a clear case of a hazard which renders the ship unseaworthy. Stowing of the lumber in such a way as to leave large holes in the otherwise flat surface of the cargo, chiefly in the remoter areas of the hold, was practically an invitation to injury. In the normal course of unloading operations the longshoremen were required to walk about on this cargo, and it was perfectly predictable that at some point one of them would fall into one of the holes and injure himself. Liability seems as clear, for instance, as in the case of the unexplained exploding of a valve where we recently reversed a finding excusing the ship from liability. Van Carpals v. S. S. American Harvester, 2 Cir., 297 F.2d 9, certiorari denied U. S. Lines Co. v. Van Carpals, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 84.

But the opinion of the majority overruling the findings below appears to reintroduce negligence concepts into the law of unseaworthiness, and thus to overthrow, by a kind of covert counterrebellion, the rule of absolute liability laid down in Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561, and Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, and recently reaffirmed in Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941. Moreover, the ship's defense, here erected into a rule of law, seems to me distressing as applied to the facts and quite pernicious in its future possibilities. It is that, as shown by its professional expert witness, this is a usual and customary stowage; and it is "likely, indeed inevitable," that cargo of this type would have such gaps and holes. Thus, contrary to Judge Murrah's sound view below, the question what constitutes good stowage is taken out of the hands of the court and given over to the industry whose practices are under attack. This seems a new departure; in Van Carpals, for instance, we did not hold ourselves bound by the industry

view that the erupting valve was faultless.

Moreover, this has prejudicial practical results. It means in substance that a workman has no chance of controverting a solid industry view, that what has been done is natural and customary in the business, unless he can produce outranking experts to testify in his behalf. It is unreal to expect this. Outside of the not inconsiderable item of fees and expense, it will be obviously difficult, if not impossible, to secure competent witnesses to testify against their own business. The questions both of safety at sea and of risk distribution will necessarily be subordinated to the conclusion that what is good for the common carrier business must be good for, or at least accepted by, those injured by odd conditions on shipboard. The more natural conclusion should be that if defendant must transport lumber in this way (and even defendant's expert admitted there were ways of covering the holes), then it must bear the risk of injury to human beings.

Actually is the majority saying anything other than that only a negligent stowage job, i. e., one which is not reasonable under the circumstances, can constitute unseaworthiness? Or at most that cargo properly stowed for carriage is seaworthy, regardless of what risks to life and limb it presents? The fundamental rationale of unseaworthiness as an absolute liability is that the shipowner must bear the loss of injuries caused by unavoidable hazards. Seas Shipping Co. v. Sieracki, supra, 328 U. S. 85, 94, 66 S.Ct. 872, 90 L.Ed. 1099. If "reasonably fit for their intended use" is to be read as the majority here has done, the shipowner will avoid liability whenever he can prove that he exercised reasonable care.

Similar conclusions may be drawn from the holding that a hazard does not render the ship unseaworthy unless it represents a divergence from usual and customary standards. If it is the custom in the trade to have hazardous conditions on shipboard, are we to conclude

that for that reason the loss incurred by such hazards is to be borne by the injured longshoreman or stevedore? In The T. J. Hooper, 2 Cir., 60 F.2d 737, 740, certiorari denied Eastern Transp. Co. v. Northern Barge Corp., 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571, Judge Learned Hand stated: "There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence * * *. Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required * * *." See Troupe v. Chicago, Duluth & Georgian Bay Transit Co., 2 Cir., 234 F.2d 253, 260; June T., Inc. v. King, 5 Cir., 290 F.2d 404, 407. In The T. J. Hooper, Judge Hand spoke in terms of negligence; the entire trend of the law of unseaworthiness since The T. J. Hooper reinforces, rather than erodes, the conclusion that the courts ultimately must set the standards.

It is significant that the majority in its expansive interpretation of "reasonably fit for their intended use" relies primarily on cases actually holding opposite to its decision here. This is true not only of Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, reversal of a court of appeals' holding that slime on the rail did not render the vessel unseaworthy, but also of the majority's apparently chief support, Boudoin v. Lykes Bros. S.S. Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354, where the Court reversed a court of appeals' decision to restore district court findings that a vessel was unseaworthy because of the belligerent characteristics of another seaman. I find my brothers' approach a prime illustration of the dangers of reading extensive negative implications into an affirmation, however narrowly they may construe it. There is no rule of logic or of practical persuasion which justifies so doing. Here

a curious consequence of this inverted logic is that the two cases regarded by my Second Circuit brothers generally as pressing the doctrine of unseaworthiness to undesirable extremes are taken as making doubtful, if not overruling, Judge Hand's landmark decision in the Hooper case. And the conclusions discovered in the Supreme Court's cautionary remarks in the Boudoin case against pressing that ground of unseaworthiness beyond seamen not equal in disposition to the ordinary men of the calling—"All men are to some degree irascible," etc.—are remarkable. To conclude that this natural limitation forces acceptance of industry methods of lumber stowage, no matter how dangerous they may be, seems to me a self-demonstrated fallacy.

So I am convinced we should proceed on the standards set by Judge Murrah, rather than upon those set by the industry. I note that at the end of his opinion Judge Hincks calls the roll of the cases in which we have this year decided against seamen in the course of what seems to me an attempt to cut down on the scope of the Supreme Court's doctrine of unseaworthiness. Although impressive in favor of one point of view, the roll is not quite complete, for there were some cases against the trend. See, as more nearly in point here, Van Carpals v. S.S. American Harvester, supra, and see also Massa v. C. A. Venezuelan Navigacion, 2 Cir., 298 F.2d 239; Usiak v. New York Tank Barge Co., 2 Cir., 299 F.2d 808; DeLima v. Trinidad Corp., 2 Cir., 302 F.2d 585. It is really unfair to describe the bitterly contested cases cited as holding the ship not necessarily unseaworthy "merely because of an accident aboard." Here were cases of serious injury resulting from some failure in the ship's operation; the question was only as to the extent of the ship's responsibility. Moreover, I think it hardly disputable that the facts make this a more extreme case of exonerating the ship and limiting its zone of responsibility than any of those cited.

I would affirm.

On Petition for Rehearing

Before CLARK, HINCKS and FRIENDLY, Circuit Judges.

PER CURIAM.

Petition for rehearing denied.

CLARK, Circuit Judge (dissenting).
I dissent in separate opinion.

On Petition for Rehearing In Banc

Before LUMBARD, Chief Judge, CLARK, WATERMAN, MOORE, FRIENDLY, SMITH, KAUFMAN, HAYS and MARSHALL, Circuit Judges.

PER CURIAM.

All of the active judges concuring, except Judge CLARK and Judge J. JOSEPH SMITH who vote to grant, the petition for rehearing *in banc* is denied.

CLARK, Circuit Judge (dissenting from the denial of the petition for rehearing and of the application for rehearing *in banc*).

Shortly after our decision herein, the Supreme Court decided the case of Salem v. United States Lines Co., 82 S.Ct. 1119, by reversing our decision in 2 Cir., 293 F.2d 121. The Court's holding was that absence of expert testimony to support the contention that the ship had failed to provide railings or other safety devices at a crow's nest platform did not bar a jury's finding of liability to a seaman for injuries caused by the unseaworthiness of the ship. Since our decision was based on a like absence of testimony to show that the lumber stowage here with the gaping holes, into one of which the plaintiff stepped, was improper, the basis of our decision has thus been eliminated. Hence the rehearing petitioned for, in my judgment, was quite necessary to bring our holding in line with the Supreme Court's view of the law and to prevent discriminatory ac-

tion against this one plaintiff. My brothers, for reasons not clear to me, have not accepted the teachings of this case and I must perforce dissent.

The slight differences in the facts of the two cases are generally not important; if anything, they show the present plaintiff's position to be stronger than was Salem's. There the finding for the plaintiff was by a jury; here it is by an experienced judge giving persuasive reasons. There the difficulty as to the lack of railings at the crow's nest platform was, if anything, less easily perceivable than were the holes in the lumber in the ship's hold. Hence expert testimony would seem somewhat more necessary and useful in Salem than here. But not only did the Supreme Court hold that there was "no error, let alone manifest error, in having a jury decide without the aid of experts"; it also said: "Nor would expert testimony about customary equippage be essential, Pure Oil Co. v. Snipes, 5 Cir., 293 F.2d 60, 71; nor, even if offered, would it have concluded the questions of unseaworthiness or negligence," citing several cases, including The T. J. Hooper, 2 Cir., 60 F.2d 737, repudiated by my brothers in their opinion.[1] 82 S.Ct. 1119, 1122, 1123 note 6.

It is true that my brothers did not base decision upon the testimony of the defendant's expert, although they recited it approvingly. But they did base decision upon "insufficient evidence" to support a finding that "such a hole in a lumber stow was at odds with the 'usual and customary standards of the calling,'" 2 Cir., 304 F.2d 506, 510, a test in itself more appropriate to negligence than to unseaworthiness. Judge Murrah, however, had expressly held that decision was for him as trier, not for experts, and he had no hesitancy in finding unseaworthiness. Under the Salem holding, that must conclude the case.

[1] The still later case of Morales v. City of Galveston, 82 S.Ct. 1226, does not touch this issue, but concerned a defect in the cargo existing before it was loaded. The Court did, however, expressly note that unseaworthiness might arise from the method of loading a ship's cargo "or the manner of its stowage." 82 S.Ct. 1226, 1230.