Nicholas P. BOORUS, Appellant,

v.

**WEST COAST TRANS-OCEANIC STEAMSHIP LINE and Standard Steamship Corp., Appellees.**

No. 17415.

United States Court of Appeals
Ninth Circuit.

Feb. 28, 1962.

894

Peterson, Lent & Paulson, Tom Price, Portland, Or., for appellant.

Wood, Wood, Tatum, Mosser & Brooke, John R. Brooke, Portland, Or., for appellee.

Before MATHEWS, BARNES and HAMLIN, Circuit Judges.

BARNES, Circuit Judge.

This is a suit for personal injuries arising out of a fist fight occurring between two crewmen of the S. S. Columbia Trader.

Stevedores finished loading that ship, owned by appellee, at a dock in San Francisco Bay at 11:40 P.M. on August 25, 1958 when beams and hatchboards were put aboard. The longshoremen left the vessel five minutes later with hatchboards in place. The last line left the dock at 11:56 P.M. and at 11:58 P.M. the vessel started down San Francisco Bay for the Golden Gate in a thick fog. Securing the hatches, i. e., placing the tarpaulin and strongbacks over the hatch beams and securing them by wooden wedges, was next required on Hatches 2, 4 and 5. It is usually the ship's carpenter who drives in such wooden wedges to make the hatch shipshape for wet weather.

When a ship is moving through fog it is sometimes necessary, in aid of a quick maneuver, to drop an anchor. As the vessel leaves a dock, the ship's carpenter first brings in the lines cast off from the dock, and then stands by the anchor windlass on the forecastle head to drop the anchor, if ordered to do so by a ship's officer. The ship's carpenter so stood by in this case. The chief mate of the S. S. Columbia Trader was also stationed on the forecastle head. He testified at this trial he was there an hour and thirty-five minutes after the ship left the dock, and that Cruse, the ship's carpenter, was there also, "ready" at the anchor windlass.

When the ship's carpenter is thus bringing in the lines or standing by at the anchor windlass, it becomes necessary for one of the able seamen to do his usual work of driving in the wooden wedges. The seaman works under the orders of the ship's boatswain. The boatswain has no authority over the ship's carpenter.

Appellant Boorus was the ship's boatswain, and he testified the carpenter, Cruse, was at his anchor windlass post only a *portion* of the time as the vessel was traveling out of San Francisco Bay; that he (Boorus) asked the carpenter to place the wooden wedges in place, but was told by the mate, then allegedly in the mess hall with the carpenter, that "Chips ain't going to put the wedges in. You take a deck maintenance or day man and put the wedges in." Appellant Boorus went to the day man, Schyllberg, who put "most of them in."

The mate (Morris) said Cruse, the carpenter, was sober; that he did not appear to be intoxicated; that he had not seen Cruse drinking, nor had anyone reported he had been drinking.

The day man, Schyllberg, "had the impression" Cruse "had had a few drinks," but did not smell alcohol on his breath.

Boorus, the appellant, was the only witness who testified Cruse was under the influence of liquor. After a dispute as to whether the carpenter should put in the wedges, or someone else under orders

from Boorus, and after Boorus and Schyllberg had put in most of the wedges, they needed more wedges. Boorus tried to get them from the carpenter shop, but it was locked. Boorus asked Cruse, "How about the keys?" Cruse swore at Boorus and "I took it the man was drunk and he wanted to get into a fight with me. He was hostile. \* \* \*" So Boorus got the keys to the carpenter shop from the mate, and when Boorus went to get more wedges a "fight" took place in the pasageway on the main deck outside the deck mess hall.

Schyllberg described it as a struggle. He separated the protagonists, but they each wanted to get back into the fray, so he let them continue, and after five minutes they quit. It was a draw. Each was cursing the other. The sole witness saw no knockdowns. He saw no one injured and testified Boorus worked the remainder of the trip and made no complaints of injuries.

*Prior* to the fight, Boorus and Cruse had "roomed" together. Boorus had once heard Cruse grind his teeth and groan. Once Cruse asked Boorus: "Do you hear them people?" Boorus answered: "What people?" or, "What voices?"

*After* the fight, Boorus told the mate: "The man is crazy, and he was trying to choke me", but made no mention of intoxication or drinking.

The next day Boorus was offered some rubbing alcohol by the mate for "a sore neck," but refused it. No other medication was sought or offered. Boorus left the ship at Portland, Oregon, on August 29, 1958. When he got back to New Orleans, Louisiana, he had his neck examined; was told there were no injuries the doctors could see; was given pills, and told to go back to work. Appellant remembers no X-rays having been taken. Later appellant's difficulties were diagnosed as bursitis.

The jury below rendered a verdict for Boorus. The court ordered a judgment non obstante veredicto. Jurisdiction below rested on 46 U.S.C.A. § 1304, here it rests on 28 U.S.C. § 1291.

Two errors are alleged—one in respect to instructions; the other in respect to the directed verdict.

Appellant's first cause of action was based on unseaworthiness; his second on negligence, and his third (with which we are not here concerned) for maintenance.

■ So far as the unseaworthiness count is concerned, it has long been settled that a shipowner is liable, because of unseaworthiness of the ship, if the *crew* is unfit or not competent to perform their duties. See discussion by Judge Learned Hand in Keen v. Overseas Tankship Corp., 2 Cir. 1952, 194 F.2d 515 at 517. From that case, Judge Hand was quoted with approval by Mr. Justice Douglas in Boudoin v. Lykes Bros. S. S. Co., 1955, 348 U.S. 336, 337, 75 S.Ct. 382, 384, 99 L.Ed. 354, as follows:

> " 'The warranty of seaworthiness as to hull and gear has never meant that the ship shall withstand every violence of wind and weather; all it means is that she shall be reasonably fit for the voyage in question. Applied to a seaman, such a warranty is, not that the seaman is competent to meet all contingencies; but that he is equal in disposition and seamanship to the ordinary men in the calling.' "

But this "does not mean that the owner is liable for injuries from all the fisticuffs on shipboard," says the Supreme Court, because as Judge Learned Hand also said in Jones v. Lykes Bros. Steamship Co., 2 Cir., 1953, 204 F.2d 815, at 817:

> "All men are to some degree irascible; every workman is apt to be angry when a fellow complains of his work to their common superior; and some will harbor their resentment and provoke a quarrel over it even after the lapse of several hours. Sailors lead a rough life and are more apt to use their fists than of-

fice employees; what will seem to sedentary and protected persons an insufficient provocation for a personal encounter, is not the measure of the 'disposition' of 'the ordinary men in the calling.' "

Where then, is the dividing line in this calling where a sailor's disposition becomes worse than the ordinary seaman? Again we are told in the latest Supreme Court case on the subject:

"The problem, as with many aspects of the law, is one of degree. Was the assault within the usual and customary standards of the calling? Or is it a case of seaman with a wicked disposition, a propensity to evil conduct, a savage and vicious nature? If it is the former, it is one of the risks of the sea that every crew takes. * * *" (Boudoin v. Lykes Bros. S. S. Co., 348 U.S. at 340, 75 S.Ct. at 385.)

And if the latter, the ship is liable.

■ Here there was no evidence of a savage or vicious nature existing in the ship's carpenter. There is no evidence of his having had any previous difficulties with the crew, or their officers. There is no proof he was intoxicated. The "fight" was described by the one eye-witness, a fellow crew member, as a "scuffle," with each participant desirous of continuing. The "fight" ended, says appellant, when the carpenter became "more or less exhausted and he let me go." The entire struggle lasted little more than five minutes. No mention of it appears in the ship's log. The participants, roommates before it occurred, continued as such on the three-day voyage to Portland. No blood was shed. No injuries were claimed by either man aboard ship. We think clearly this incident falls within the risks ordinary seamen run on any ordinary crew.

■ The jury evidently found nothing extraordinary in Cruse's disposition, for it answered Special Interrogatory Number 1 in the affirmative. It read:

"Was the vessel's carpenter, Henry Cruse, fit, competent and equal in disposition to the ordinary man employed as a merchant seaman?"

Appellant concedes this instruction was properly asked of the jury, and that the jury's answer would prevent any argument as to unseaworthiness, except that, he urges, the proper instruction, quoted above, was spoiled by the addition of the following language:

"Before you are warranted in finding the vessel's carpenter not equal in disposition to ordinary men in the calling, you must find from a preponderance of the evidence that the carpenter had a wicked disposition and that he had a propensity to evil and bad conduct."

While we do not approve such an instruction, particularly one in the conjunctive, as necessary or necesssarily complete, we cannot agree that such additional instruction was error. The jury had been told what the ordinarily disposed seaman was (equal in disposition and seamanship). Next it was told what he was not (i. e., not one with a wicked disposition or one with propensity to evil). What is meant by a crew member with a disposition equal to the ordinary man in this particular calling? Webster's Dictionary lists the seventh definition of "disposition" as:

"A relative permanent tendency to act in any certain way * * * whether inherited or derived from previous experience; as, a *disposition* to self assertion."

We think the trial judge did an excellent job in aiding the jury deliberations, keeping in mind and using as might have been expected, the precise language used in the latest Supreme Court guide, Boudoin v. Lykes Bros. S. S. Co., supra.

Appellant cites two district court cases as authority for the proposition that the criticized instruction created error: Handley v. United States, S.D.N.Y. 1958, 157 F.Supp. 616, and States Steamship Co. v. Howard, D.Or.1960, 180 F. Supp. 461. We do not find them similar on the facts. In Handley, supra, Handley was threatened by one Wilson, who

had been described as a pugnacious individual and a bully. In Howard, supra, Howard had been obnoxiously intoxicated for several hours, which augmented "a prior and pre-existing unfriendly attitude" toward his victim. Similar facts are not present in this case. Here the jury found the carpenter was fit, competent and equal in disposition to the ordinary seaman.

What we have said above establishes there was no error with respect to the claimed unseaworthiness of appellee's vessel. We next reach alleged error number two, the granting of the judgment non obstante veredicto upon the charge of negligence, as found by the jury. Appellant urges, by his own interpretation and by inference from the evidence "most favorable to the plaintiff" (Appellant's Brief, pp. 10, 11) that there existed direct knowledge by the owner through the mate "that the carpenter was too drunk to perform his duties." There is not the slightest direct evidence the carpenter was too drunk to perform his duties. But there is, says appellant, an inference. We do not agree. If it be said a man was "sick," and no more, to infer he was "too sick" to perform his duties is improper. The mate who worked with Cruse thought he was sober. The accused man (Cruse) was dead, so he could not testify. The peace-maker "had the impression" Cruse had had a few drinks. The most the appellant himself could say on direct examination was that "*I took it* the man was drunk, * * * he wanted to get into a fight with me" (emphasis ours); "he was hostile." No one saw Cruse drink, no one testified Cruse had had anything to drink *on board the ship.* Significantly, the appellant complained to the mate the next morning, when telling of the "fight" incident, not that Cruse had been drunk, but that "that man is crazy." It was only on rebuttal, after the death of Cruse (and his inability to testify was established) that appellant testified Cruse "was drunk."

In view of the utter lack in the record of any proof of intoxication, or previous insanity, which might render appellee negligent, and the utter lack of any proof of an evil disposition, or any propensity to bad conduct, or any previous fights or fisticuffs, or any pre-existing disposition toward any of these things, which might have required appellee, as an ordinarily prudent employer, to place Cruse in restraint, we agree the trial court acted properly in this case in holding there was no evidence of negligence, and in granting the judgment non obstante veredicto. Guzzi v. Seas Shipping Co., Inc., 2 Cir. 1959, 270 F.2d 714; Connolly v. Farrell Lines, Inc., 1 Cir. 1959, 268 F. 2d 653.

Finding no error, we affirm.