[Civ. No. 30642.   Second Dist., Div. One.   Apr. 12, 1967.]

MILTON K. FOSS, Plaintiff and Respondent, v. OLIVER J. OLSON & COMPANY, Defendant and Appellant.

Sikes, Pinney & Matthew and John Scott Matthew for Defendant and Appellant.

James H. Ackerman and Carlton E. Russell for Plaintiff and Respondent.

LILLIE, J.—Plaintiff, the third mate on the lumber schooner *George Olson*, sued defendant owner of the vessel for damages for personal injuries resulting from an assault on him by a crew member. The incident occurred on the navigable waters of the United States on board the vessel at the port of Coos Bay, Oregon. The action is predicated on breach of a shipowner's warranty of seaworthiness of the vessel and negligence, under the Jones Act (46 U.S.C.A. § 688); the rights and liabilities of the parties are governed by the maritime laws of the United States. Defendant appeals from judgment against it and in favor of plaintiff for $2,500 entered on a jury verdict.

The *George Olson* was taking aboard a cargo of plywood; crew members were handling and storing the cargo in the

hold. Thomas Hooker, a seaman, was operating a 15-ton forklift vehicle in the forward hold stacking loads of plywood weighing nearly four tons each into a position for carriage at sea. Two crew members were in the hold assisting in the positioning of each four-ton load.

The incident between plaintiff and Hooker was in dispute; only the testimony of the two men was offered at the trial. The following is plaintiff's version and the one accepted by the jury as true. In his capacity as third mate, a licensed ship's officer, plaintiff was standing at the edge of the open hatch on the main deck supervising the plywood loading operations below. Toward evening he observed that the heavy stacker, or forklift, operated by and under the control of Hooker was being used by him in an erratic manner—he was "flipping" the controls around, steering erratically, and gunning the motor back and forth; the heavy load on the forklift was going up and down and tipping to such an extent that it was endangering two crewmen working in the hold. He "saw a dangerous situation" and "went and got the Chief Mate," his superior officer, and "brought him to the hatch to look into the hold." After a conversation, the Chief Mate directed plaintiff to go into the hold, send to him a crew delegate (who represents the unlicensed crew, so he could discharge Hooker) and "straighten out the man on the stacker." Pursuant to the Chief Mate's orders, plaintiff descended into the hold, held up his hands signaling Hooker to stop the stacker and told him, "Stop." Hooker did so saying to plaintiff, "I haven't been drinking" (Hooker admitted in his deposition that he had a beer on the job during loading). Plaintiff then told him to get down off the stacker; as he did so, Hooker walked up to plaintiff and without provocation "slugged" him on the nose knocking him down, causing serious injury. As a result of the incident, defendant fired Hooker. In the nine months prior to the assault, Hooker had been known to the vessel's second mate to be a drinker and "somewhat rowdy."

The defense is reflected in the deposition of Hooker read at the trial. He was moving the stacker with three to four tons of lumber on its forks into position in the stow when plaintiff grabbed his arm; he was "trying to jam me off." Had plaintiff removed him, the stacker, which weighed approximately fifteen tons, would have mashed two crew members against another load, thus with his open hand he gave plaintiff a "stiff arm" shove to get him away. He continued to move the

hyster in an effort to stow the load and yelled at the two crew members to get out from under the load; when he next looked at plaintiff he saw him get up from a pile of two-by-fours he had stumbled across and grab a two-by-four. He stopped the stacker and as he stepped off, plaintiff started to turn on him with the two-by-four, rearing back to hit him; as he jumped back a crew member (Monroe) kicked the two-by-four out of plaintiff's hand. Plaintiff at no time struck him. Plaintiff's nose was not cut, only his lip was cut when he fell on the two-by-fours. The method in which he was driving the forklift was his customary way and as far as he knew the customary practice; and except for the incident herein, he had never hit or shoved anyone and had never had any form of fight aboard the vessel.

Appellant's main complaint is that the jury was not adequately instructed as to the standard to which a seaman must be held for a vessel to be found unseaworthy.

The jury was instructed as follows: "Plaintiff's second claim is that he was injured as a proximate result of the unseaworthiness of the ship.

"Under the Maritime Law every shipowner owes to every seaman employed aboard the vessel the continuing duty to keep the ship, her hull, cargo, equipment and personnel in a seaworthy condition at all times and a shipowner is liable to a seaman for injuries and damages proximately caused by an unseaworthy condition. Such liability for unseaworthiness does not in any way depend upon negligence or fault or blame on the part of the shipowner. Indeed such liability on the part of the shipowner exists even though the shipowner may have exercised due care under the circumstances and may have no notice or knowledge of the unseaworthy condition which causes injury or damage.

"The shipowner's duty to keep the ship in a seaworthy condition cannot be delegated or entrusted to others.

"A vessel is seaworthy when her hull, cargo, equipment and personnel are reasonably fit for the intended service of the ship. *A vessel is unseaworthy when her hull, cargo, equipment or personnel are not reasonably fit for the intended service of the ship. A vessel may be unseaworthy if her crew includes a member who is not fit, competent, and equal in seamanship and disposition to men ordinarily employed as merchant seamen.*

"When a seaman serves aboard a vessel he assumes all inherent and unavoidable risk of his occupation, but he does not

assume any risk of unseaworthiness of the vessel on which he is employed." (Italics added.)

The foregoing contains the proper standard of conduct below which the acts of a merchant seaman can render a vessel unseaworthy. Accordingly, if he is not reasonably fit for the intended service of the ship, a vessel is unseaworthy; and the vessel may be unseaworthy if her crew includes a member who is not fit, competent and equal in seamanship and disposition to men ordinarily employed as merchant seamen. The instruction adequately and correctly states the principles of law set out in *Keen* v. *Overseas Tankship Corp.* (2d Cir. 1952) 194 F.2d 515 and *Boudoin* v. *Lykes Bros. Steamship Co.*, 348 U.S. 336 [99 L.Ed. 354, 75 S.Ct. 382]. While conceding that the instruction contains a correct statement of the law, appellant argues that it did not go far enough; that the trial judge erred in refusing to give its requested instructions[1] based upon *Jones* v. *Lykes Bros. Steamship Co.* (2d Cir. 1953) 204 F.2d 815; *Boudoin* v. *Lykes Bros. Steamship Co.*, 348 U.S. 336 [99 L.Ed. 354, 75 S.Ct. 382]; and *Boorus* v. *West Coast Trans-Oceanic Steamship Line*, (9th Cir. 1962) 299 F.2d 893. These cases involve assaults committed in the course of an ordinary sailor's brawl generated by personal differences between the two participants; in the instant case, neither version of the incident supports any kind of mutual combat or an assault arising out of personal animosity. The unprovoked attack on plaintiff was made by an ordinary seaman in defiance of the authority and orders of a licensed officer. The only questions relevant to the issue of the vessel's seaworthiness, under the facts, related to whether Hooker was reasonably fit for his

---

[1](Defendant's proposed Instruction No. 3.)

"Sailors lead a rough life and are more apt to use their fists than sedentary workers. You are not to judge whether Thomas Hooker was up to the standard of seaworthiness by comparing him with land employees. You are to judge him in that respect in comparison with other sailors.

"Accordingly, unless you find by a preponderance of the evidence that Thomas Hooker was not equal in disposition and seamanship to the ordinary seaman, then you must find in favor of the defendant shipowner on the issue of the claimed unseaworthiness."

(Defendant's proposed Instruction No. 4.)

"Before you are warranted in finding the shipowner's employee Thomas Hooker not equal is disposition to ordinary men in the calling, you must find from a preponderance of the evidence that said Hooker had a wicked disposition or that he had a propensity to evil and bad conduct."

(Defendant's proposed Instruction No. 5.)

"The definition of the word 'disposition' as used in these instructions is as follows:

" 'A relative permanent tendency to act in any certain way.' "

duties on the vessel and fit, competent and equal in seamanship and disposition to men ordinarily employed as merchant seamen; and these questions were properly submitted to the jury under the instructions given by the trial court. (*Keen* v. *Overseas Tankship Corp.* (2d Cir. 1952) 194 F.2d 515.)

██ "It has long been settled that the assured's warranty of his ship's seaworthiness in a maritime policy is broken if the master or the crew are not competent for their duties. . . . The warranty of seaworthiness as to hull and gear has never meant that the ship shall withstand every violence of wind and weather; all it means is that she shall be reasonably fit for the voyage in question. Applied to a seaman, such a warranty is, not that the seaman is competent to meet all contingencies; but that he is equal in disposition and seamanship to the ordinary men in the calling." (*Keen* v. *Overseas Tankship Corp.* (2d Cir. 1952) 194 F.2d 515, 517-518.) ██ Accordingly, a seaman must be reasonably fit in temperament as well as competency and ability for his intended service on the vessel; and recovery by a seaman based on the unseaworthiness of the vessel may be had against the owner for injuries sustained by reason of an attack by a fellow seaman who is not equal in disposition to the ordinary merchant seaman. (*The Osceola*, 189 U.S. 158 [47 L.Ed. 760, 23 S.Ct. 483]; *Seas Shipping Co.* v. *Sieracki*, 328 U.S. 85 [90 L.Ed. 1099, 66 S.Ct. 872]; *Boudoin* v. *Lykes Bros. Steamship Co.*, 348 U.S. 336 [99 L.Ed. 354, 75 S.Ct. 382].) ██ *Keen* v. *Overseas Tankship Corp.* (2d Cir. 1952) 194 F.2d 515, also established that the doctrine of seaworthiness does not require that the owner have knowledge of the incompetency or vicious proclivities of crew members as a condition of liability for assaults committed by them; the warranty extends to unknown inadequacies as well. The warranty of seaworthiness is a species of liability without fault. (*Seas Shipping Co.* v. *Sieracki*, 328 U.S. 85, 90-94 [90 L.Ed. 1099, 1103-1106, 66 S.Ct. 872].) "Yet," as stated in *Boudoin* v. *Lykes Bros. Steamship Co.*, 348 U.S. 336, 338-339 [99 L.Ed. 354, 357-358, 75 S.Ct. 382], "it does not mean that the shipowner is liable for injuries 'resulting from every sailors' brawl,' as Judge Learned Hand put it in *Jones* v. *Lykes Bros. S.S. Co.* (2d Cir. 1953) 204 F.2d 815, 816. . . ." The court in *Jones* v. *Lykes Bros. Steamship Co.* (2d Cir. 1953) 204 F.2d 815, and rightly so, applied a limitation on liability in assault cases; *Keen, Jones* and *Boudoin* sought to balance the equities by holding that on the one hand shipping companies should be protected against having to indemnify

each and every recipient of injury resulting in the course of an ordinary sailor's brawl, and on the other, seamen should be protected against the out-of-the-ordinary risks of a seaman's calling—the assaults that go beyond the type to be anticipated between seamen.

While the three cases upon which appellant relies for the propriety of its proposed instructions (*Jones* v. *Lykes Bros. Steamship Co.* (2d Cir. 1953) 204 F.2d 815; *Boudoin* v. *Lykes Brothers Steamship Co.*, 348 U.S. 336 [99 L.Ed. 354, 75 S.Ct. 382]; *Boorus* v. *West Coast Trans-Oceanic Steamship Line* (9th Cir. 1962) 299 F.2d 893), involve brawls between seamen arising out of personal animosity, neither version of what occurred on board the *George Olson* reflects anything similar to personal dislike or mutual combat between plaintiff and Hooker.. According to plaintiff, Hooker, without provocation, struck a vicious blow to his nose while he (plaintiff) was in the performance of his duties of carrying out the orders of his superior officer, the Chief Mate. Nor does Hooker's story indicate either personal differences or mutual combat. It denies the blow to plaintiff's nose; Hooker simply said that to prevent plaintiff from pulling him off the stacker, he gave plaintiff a "stiff arm" shove to get him away. Neither party testified that plaintiff struck or attempted to strike Hooker before the assault; Hooker was simply insubordinate in his attitude. While Hooker stopped the stacker as ordered, in defiance of the authority of the third mate, who was carrying out the orders of his superior officer in the course of defendant's business, he walked up to and assaulted him. The court's instruction, correct in its statement of the law, was adequate to guide the jurors in their determination whether Hooker was fit and competent as a member of the crew and equal in seamanship and disposition to men ordinarily employed as merchant seamen.

■ In connection with plaintiff's cause of action based on negligence, appellant contends that the trial court incorrectly applied the standard of a person of ordinary prudence[2] be-

---

[2] "Ordinary care is that care which persons of ordinary prudence exercise in the management of their own affairs in order to avoid injury to themselves or to others." (Instruction No. 102.)

"Negligence is the doing of an act which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, actuated by those considerations which ordinarily regulate the conduct of human affairs. It is the failure to use ordinary care in the management of one's property or person.

"Negligence is not an absolute term, but a relative one. By this we mean that in deciding whether there was negligence in a given case, the

cause *Jones* v. *Lykes Bros. Steamship Co.* (2d Cir. 1953) 204
F.2d 815; *Boudoin* v. *Lykes Bros. Steamship Co.*, 348 U.S. 336
[99 L.Ed. 354, 75 S.Ct. 382] ; and *Boorus* v. *West Coast Trans-
Oceanic Steamship Line* (9th Cir. 1962) 299 F.2d 893, hold
that applicable to seamen is the standard of being competent
and equal in disposition to the ordinary man employed as a
merchant seaman.

The standard of conduct used in the foregoing authorities
was applied in the determination of the seaworthiness of the
vessel; in those cases the issue of negligence was not before
the court and the standard of conduct for measuring a ship-
owner's negligence was not an issue. Involved therein was
breach of warranty of seaworthiness. In the instant case, the
cause of action for negligence was properly submitted on in-
structions based on the standard of conduct of a person of
ordinary prudence. The test of defendant's negligence was
whether it exercised reasonable care for the safety of plaintiff.
Under the evidence, the factual issue was whether there had
been adequate notice to the defendant through its managing
agent, the second mate (*Fall* v. *Esso Standard Oil Co.*, 297
F.2d 411, 417), that Hooker was a drinker and trouble maker.

The evidence supports a finding of negligence on the
part of defendant—the owner of the vessel permitted a man,
known to its managing agent to be a drinker and ''somewhat
rowdy,'' to operate a 15-ton forklift carrying four-ton loads
in quarters where it could endanger other crew members. This
was not the action of a reasonably prudent shipowner.

Finally, appellant claims that the court's instruction,
''It is unlawful for a seaman to assault the master or mate of
a vessel'' (a restatement of the maritime law 46 U.S.C.A.
§ 701]) was incomplete in that the term ''assault'' was not
defined thus creating the inference that Hooker was guilty of
an unlawful act if he in fact assaulted plaintiff, which infer-
ence had an inflammatory effect on the jury. While plaintiff

---

conduct in question must be considered in the light of all the surround-
ing circumstances as shown by the evidence.'' (Instruction No. 101,
Revised.)

''One test that is helpful in determining whether or not a person was
negligent is to ask and answer whether or not, if a person of ordinary
prudence had been in the same situation and possessed of the same knowl-
edge, he would have foreseen or anticipated that someone might have
been injured by or as a result of his action or inaction. If such a result
from certain conduct would be foreseeable by a person of ordinary pru-
dence with like knowledge and in like situation, and if the conduct reason-
ably could be avoided, then not to avoid it would be negligence.'' (In-
struction No. 101-C.)

requested the instruction (which the court gave on its own motion) shortly before the instructions were read to the jury, defendant nevertheless had ample opportunity to voice the objection he now makes.

We find no error in the failure of the court to define ''assault,'' a word of common usage. Jurors know what is meant by the term without the court having to define it. ''Since jurors are presumed to possess ordinary intelligence and to be capable of understanding the meaning and use of words in their common and ordinary application, the trial judge is not required to define simple words and phrases employed in an instruction. (48 Cal.Jur.2d (1959), Trial, § 181, p. 209.)'' *(Pobor v. Western Pac. R.R. Co.,* 55 Cal.2d 314, 323 [11 Cal. Rptr. 106, 359 P.2d 474].) As pointed out by respondent, the term ''assault'' is not defined in such common civil jury instructions as those pertaining to the duty of a carrier to protect one passenger from another. (See BAJI 204-M [4th Ed. 1956].)

The judgment is affirmed.

Wood, P. J., and Fourt, J., concurred.