[Civ. No. 41634. Second Dist., Div. Five. June 25, 1974.]

GARLAND BELL, Plaintiff and Appellant, v.
SEATRAIN LINES, INC., Defendant and Respondent.

## COUNSEL

Boccardo, Blum, Lull, Niland, Teerlink & Bell, Edward J. Niland and Stanley A. Ibler, Jr., for Plaintiff and Appellant.

Lillick, McHose, Wheat, Adams & Charles and Kenneth R. Chiate for Defendant and Respondent.

## OPINION

**KAUS, P. J.**—Maritime personal injury case. Plaintiff Garland Bell brought an action based on theories of negligence under the Jones Act (46 U.S.C. § 688; 45 U.S.C. § 51) and unseaworthiness under general maritime law, against defendant Seatrain Lines, Incorporated. The trial

court directed a verdict in favor of defendant on the Jones Act count;[1] the jury brought in a verdict in favor of defendant on the unseaworthiness theory. Plaintiff appeals from the judgment entered on the verdict.

## FACTS

Plaintiff, in January 1968, was an assistant engineer on the *S.S. Seatrain Savannah,* a cargo ship headed for the Orient. On January 29, 1968, the ship anchored about four miles off Qui Nhon, Vietnam, awaiting a berth at the dock so that it could unload its cargo. Several other ships were anchored offshore.

An agreement between defendant and plaintiff's union provided that off-duty personnel were entitled to shore leave. The agreement also provided that when the vessel arrived "at a safe harbor," defendant "shall furnish" daily roundtrip launch service "when weather permits and when regular service is available."

The Tet offensive was going on at the time and Qui Nhon was generally under attack by the Viet Cong. There was no regular launch service available. All of the launches used to bring crewmen to shore from ships anchored off Qui Nhon were operated by the Military Sea Transport Service (MSTS), under the control of the Navy.[2] The ship's personnel never knew who would be operating the launches, whether Navy personnel, Koreans or Vietnamese working for the Navy. They never even knew ahead of time whether there would be launch service. When the launches arrived, sometimes MSTS would have notified the ship a few hours in advance, but sometimes a launch would appear without any advance notice.

The first mate, in testimony, assumed that the ship's captain would try to get launch service by contacting MSTS. Plaintiff testified that to get launch service, the mate on watch normally calls for a launch to take crew members ashore. Plaintiff did not pay anything for the launch service in Qui Nhon harbor; he had never paid for launch service. There was no evidence who paid for the launch service at Qui Nhon.

The first mate testified that when the Navy sent out a launch, he assumed it was safe and that the Navy would provide personnel on the

---

[1] By stipulation, the jury was not formally directed to bring in a verdict on the Jones Act theory, to avoid prejudicing it on the unseaworthiness theory.

[2] Of some, although not critical, importance is the total absence of correlative evidence concerning the identity of the operator or operators available to bring crewmen who were already ashore back to their ships.

launch who would keep the seamen under proper control. There was evidence from the first mate and the third mate that once the crew members left the vessel and boarded the launch to go ashore, they were on "their own time" and could go "anywhere they like[d]." No officer was assigned to go ashore and supervise their conduct since it was "not customary in the industry" for this to be done. Once the men left the vessel and boarded the launch, the ship's officers had no control over their conduct or activities. It was customary for men on shore leave in Qui Nhon to drink in the bars or in the seamen's club. Some of the men would get drunk and sometimes would get into fights.

The first night plaintiff's ship was in Qui Nhon harbor, no shore leave was allowed by military authorities because the town was under attack, and there was no launch service available. The incident that led to plaintiff's injuries occurred the second night, January 31, 1968.

Late that afternoon, a launch pulled up to the *S.S. Seatrain Savannah* to pick up seamen who wanted to go ashore. Before leaving the ship, the men signed a warning notice furnished by the captain. The document stated that MSTS had informed the captain that liberty launches were being sent out, but that the town was still under attack. Crewmen were advised not to go ashore and warned that they did so at their own risk; however the choice was theirs.

The launch was operated by a Korean crew. Among the *S.S. Seatrain Savannah* seamen who took the launch were David Velandra, Wayne Vore, Robert Corey, Ernest Shreck,[3] and plaintiff.

Plaintiff was the only officer who had gone ashore. He had not been given any orders to supervise or control the crew members on the launch. Velandra was a baker on the ship; he was only casually acquainted with plaintiff. On the trip from the ship to the dock there were no incidents of any kind. While ashore plaintiff and other crew members spent several hours visiting bars, drinking beer and whiskey. Eventually the Military Police or some Vietnamese or Koreans told them that the Viet Cong were moving into the area and ordered them to return to the dock. Some of the men stopped en route to the dock to buy bottles of liquor which they consumed in the launch on the way back to the ship. Plaintiff, too, did some drinking in the launch.

When the men arrived at the dock there was only one launch there, operated by a Korean. There was no other evidence at trial to further

---

[3]All of whom testified by way of depositions.

identify the launch owner or operator. (See fn. 2, *supra*.) Plaintiff did not know whether the launch operator could speak English.

The launch had crew members from all the ships in the harbor, including the S.S. *Margaret Brown*, about 20 to 28 men in all. All the men on board the launch were drinking and talking.

When the launch stopped by the S.S. *Margaret Brown* to let crew members of that ship climb aboard by means of the Jacob's ladder, a dispute arose between plaintiff and Velandra, concerning a young seaman who appeared to be injured. Plaintiff stated that the young man should be left in the launch to be taken ashore for medical treatment; Velandra was helping to have the man hauled on board with a line.

The details of the incident that followed are disputed. The versions are as follows:

Plaintiff testified that he was viciously assaulted with fists and feet by Velandra and several unidentified men. Velandra testified that plaintiff, who was drunk, accidentally fell. Vore testified that Velandra punched plaintiff eight or nine times. Corey testified that Velandra slapped or chopped plaintiff once and other seamen kicked him. Vore and Corey admitted signing statements after the incident in which they said plaintiff had fallen.

When the launch returned to the S.S. *Seatrain Savannah*, plaintiff was given medical treatment by the captain and chief mate. Qui Nhon was under attack that night and there were no launches available to transport plaintiff ashore for medical treatment. The next day he was sent ashore for treatment on a special MSTS launch. About two weeks later, the Coast Guard conducted an investigation concerning plaintiff's injuries and the captain was instructed to take plaintiff to Okinawa and have him signed off as a "medical" for repatriation to the United States. This was done.

DISCUSSION

*Directed Verdict on Jones Act Count*

Plaintiff's argument that the Jones Act count should have been submitted to the jury does not rest on a theory that defendant was liable for Velandra's assault under the doctrine of *respondeat superior* or on a submission that any of defendant's officers, agents, or employees were negligent in hiring Velandra as a person of known dangerous propensities. Rather, plaintiff submits that the launch operators were negligent—

mainly, it seems, in permitting the passengers to drink themselves into a state of combativeness—and that defendant is legally responsible for their negligence. This last proposition is the weak link in plaintiff's chain of reasoning.

A remarkably similar case was decided by another division of this court about two years ago. *Dixon* v. *Grace Lines, Inc.,* 27 Cal.App.3d 278 [103 Cal.Rptr. 595], also involved a plaintiff seaman on shore leave in Qui Nhon. Unable to return to his ship because MSTS had closed down operations for the day, the plaintiff walked to a "native pier" from which native launches took seamen to their ships at their own expense. While on the pier he walked onto a defective plank which broke, causing the injuries complained of. The trial court granted a summary judgment in favor of the defendant, from which the plaintiff appealed.

In the course of its opinion the court set forth the law applicable to a shipowner's duty to a sailor on shore leave. "In actions under the Jones Act, it has been held that while a shipowner owes a seaman the duty to provide a safe place in which to perform his work as a seaman, that duty does not extend to his protection when he goes beyond the premises of his employment for purposes of his own and over premises of which his employer has no dominion or control. [Citations.] Hence, a shipowner is not under a duty to provide a seaman with a safe means of going ashore and returning to his ship beyond the ship's gangplank. [Citations.] More to the point of the instant case, a shipowner has no duty to furnish transportation to and from the ship to seamen granted shore leave when the ship is anchored away from the dock. [Citations.]

"However, *if a shipowner contracts with a third party to provide launch service to and from the ship, and a seaman using such facilities is injured through the negligence of the third party, the shipowner may be liable under the Jones Act.* [Citation.] Liability may be imposed on the theory that where the injury is caused in whole or in part by the fault of others performing, under contract, operational activities of the employer, such others are 'agents' of the employer within the meaning of the Federal Employers' Liability Act [citation], a principle which applies with equal force in actions under the Jones Act. [Citation.] Therefore, if defendant here contracted with the owner of the native boat to transport crewmen of the Santa Ines to the vessel, defendant could be liable for injuries suffered by plaintiff through negligence of the boat owner.

"Plaintiff contends defendant was negligent under the Jones Act in failing to issue 'reasonable safety instructions, regulations and require-

ments' concerning transportation for seamen granted shore leave in Qui Nhon. Specifically, plaintiff argues that defendant was under a duty to arrange for transportation by M.S.T.S. launches because such launches and the M.S.T.S. pier were safely equipped, maintained and operated, while the native boats and native pier were not. The contention is without merit. As previously stated, a shipowner has no Jones Act duty to provide transportation to and from the vessel for crewmen granted shore leave. Moreover, the shipowner is not under a duty to inspect a dock area owned and controlled by third parties before granting shore leave to crew members, or to warn them of any hazards in such area. [Citations.]" (*Dixon* v. *Grace Lines, Inc., supra,* 27 Cal.App.3d at pp. 287-288.)[4]

Essentially the parties to this appeal agree that the correctness of the directed verdict on the Jones Act count depends on whether there was an "oral or written contract" (*Tim* v. *American President Lines, Ltd.,* (9th Cir. 1969) 409 F.2d 385, 388) with the launch operators. On this issue plaintiff faces two formidable hurdles: First, there really is no evidence in the record who operated the launch which started to carry plaintiff back to his ship;[5] second, even assuming that the evidence to the effect that all the launches used to bring crewmen to shore were operated by MSTS—an arm of the United States Navy—could be stretched to imply that the Navy had a similar monopoly on bringing crewmen back to their ships, there is not one scintilla of evidence in the record that anyone except the American taxpayers furnished and paid for this service. The fact that MSTS launch service was provided only on such occasions as MSTS chose to provide it, strongly suggests that the service was nothing but an amenity proffered by the government.

We conclude that no agency relationship between defendant and the unidentified owner of the launch in question was shown.

---

[4]The *Dixon* court reversed the summary judgment because the defendant's declarations to the effect that it had not contracted with the native launch to take seamen back to the ship were incompetent. It is important to note that this holding by no means implies that at the trial, in order to avoid a directed verdict, the burden of going forward with evidence on the issue of a contract rested on the defendant. (*Barnes* v. *Blue Haven Pools,* 1 Cal.App.3d 123, 127 [81 Cal.Rptr. 444]; see also, *Pearl* v. *Shore,* 17 Cal.App.3d 608, 613 [95 Cal.Rptr. 157]; *Fuller* v. *Goodyear Tire & Rubber Co.,* 7 Cal.App.3d 690, 693 [86 Cal.Rptr. 705].)

[5]In *Dixon* v. *Grace Lines, Inc., supra,* 27 Cal.App.3d 278, there was affirmative evidence that native launches were available to carry seamen back to their ships. In this case the record is blank.

Finally, plaintiff points to the agreement between his union and defendant that launch service was to be provided when the vessel arrived at a safe harbor and when regular service was available.

The assumption of that argument appears to be that if the employer was under a duty to furnish launch service, then any launch service procured by plaintiff was necessarily furnished by the employer and a contract between the employer and the launch operator may be inferred. We do not pause to examine the logic of that assumption, since it clearly appears that the conditions giving rise to the duty did not prevail in Qui Nhon harbor at the critical time.

There was some conflict in the evidence with respect to whether or not Qui Nhon was a "safe harbor" within the meaning of the contract.[6] Undisputed, however, is that no regular launch service was available at the time. We do not imply that for the launch service to be "regular" it had to operate on a precise schedule like a commuter train service. Yet if the word is to have any meaning, it surely does not encompass service which materializes at the whim of the operator.[7]

We conclude that the directed verdict on the Jones Act count was properly granted.

*Unseaworthiness Count*

Plaintiff's theory on unseaworthiness was based on the temperament of Velandra, his assailant. It was delineated to the jury in a series of instructions requested by plaintiff and, in the main, given as requested: "Under the Maritime Law every shipowner owes to every seaman employed aboard the vessel the continuing duty to keep the ship, her hull, cargo, equipment and personnel in a seaworthy condition at all times, and a shipowner is liable to a seaman for injuries and damages proximately caused by an unseaworthy condition. Such liability for unseaworthiness does not in any way depend upon whether or not the shipowner was negligent or at fault. The duty to provide and to maintain a seaworthy vessel is an absolute one, and liability for an unseaworthy condition exists even though the shipowner under the circumstances may have had

---

[6]The chief mate testified that ordinarily "safe harbor" referred to weather conditions. When asked whether the word "safe" related to war conditions, he replied: "No. This is something else entirely, this Vietnam situation." We need not discuss whether the portion of the union agreement dealing with launch service, dated June 1961, was intended to have any application to situations like that prevailing during the Tet offensive in 1968.

[7]Here again we assume in plaintiff's favor that the record permits an inference that the launch he boarded to return to his ship was MSTS operated.

no notice or knowledge of the unseaworthy condition which causes injury or damage.

"A vessel is unseaworthy when her hull, cargo, equipment or personnel are not reasonably fit for the intended service of the ship. A vessel may be unseaworthy if her crew includes a member who is not fit, competent and equal in disposition and seamanship to men ordinarily employed as merchant seamen.

"A seaman must be reasonably fit in temperament as well as competency and ability for his intended service on the vessel, and recovery by a seaman based on the unseaworthiness of the vessel may be had against the shipowner for injuries sustained by reason of an attack by a fellow seaman who is not equal in disposition to the ordinary merchant seaman. The doctrine of seaworthiness does not require that the owner have knowledge of a vicious and unreasonably belligerent disposition of crew members as a condition of liability for assaults committed by them. The warranty extends to unknown vicious propensities as well.

"If a seaman commits an assault upon a fellow seaman, and if such assault is unusually vicious or savage, the happening of such an assault may be regarded as evidence that the assailant was a person with unusual propensities toward violence who was not equal in disposition to the ordinary merchant seaman.

"If defendant breached the warranty of unseaworthiness towards the plaintiff in this action and if the breach contributed in any way to the plaintiff's injury at the time of the incident in question such shipping company or employer shall be liable for damages to that employee for that injury.

"If you find from the evidence that the assault upon Mr. Garland O. Bell indicated a propensity to evil conduct, a savage and vicious nature, then you may find that the defendant owner of the vessel breached his warranty of seaworthiness toward Mr. Bell.

"However, if you find that the assault was within the usual and customary standards of calling of a seaman, then you will find that the ship is not liable."

We have thought it useful to set forth at some length the basic instructions on the issue of unseaworthiness which the court gave, since all of the asserted errors relate to other instructions given.

Plaintiff first complains of a lengthy instruction given at defendant's

request by which the court attempted to give the jury specific guidelines in determining when a seaman may be found to have a disposition more vicious than that of the ordinary merchant seaman. The defendant's request for the instruction, together with the authorities relied upon, is copied in the footnote.[8]

[8]"The warranty of seaworthiness as it applies to this case requires that each member of the crew be 'equal in disposition and seamanship to the ordinary men in the calling.'[1]

"To determine whether a crew member is equal in disposition and seamanship to the ordinary men in the calling you should determine whether the behaviour of the crew member was 'within the usual and customary standards of the calling' or whether it was behaviour 'of a seaman with a wicked disposition, a propensity to evil conduct, or a savage and vicious nature'.[2] 'If it is the former, it is one of the risks of the sea that every crew takes.'[3] If it is the latter, the shipowner is liable. 'It is always an issue of degree. A seaman's shipboard conduct is not measured by the same standard as the conduct of ordinary men ashore.'[4] I have mentioned that the warranty of seaworthiness is a species of liability without fault. 'Yet it does not mean that the shipowner is liable for injury resulting from every sailor's brawl. . . . It does not mean that the owner is liable every time a seaman gets drunk and does damage to a member of the crew. It does not mean that the owner is liable for injuries from all the fisticuffs on shipboard.'[5]

"The reason for this is that 'seamen's brawls are not uncommon, either on board ship or off. The confinement of the ship's frame, the forced continuous interaction of the members of the crew, the cramped living conditions, the ennui which often accompanies shipboard routine are factors which often induce conditions which inflame those who possess short tempers and occasionally even those reputed for even-temperedness. The shipowner warrants that his ship is seaworthy to the extent that the members of the crew are of a disposition common to the ordinary man in the calling. That "ordinary man" as we have seen, lives under conditions quite "extraordinary" when viewed through the eyes of the landlubber.'[6] You should keep in mind that 'sailors lead a rough life and are more apt to use their fists than office employees; what will seem to sedentary and protected persons an insufficient provocation for a personal encounter, is not the measure of the "disposition" of the "ordinary man in the calling." '[7]

"In evaluating whether those who injured plaintiff were below the standards of their calling you should include in your consideration the following factors: Whether or not a dangerous weapon was used, the extent of any provocation, who was the instigator of the incident, the force, if any, used to repel the assault, whether there are prior incidents touching on the character traits of those involved, the evidence of contrition and the position or office of the assailant.[8]

"[1]*Kirsch* vs. *United States,* 450 F.2d 326 (9th Cir. 1971); *Stecheon* vs. *United States,* 439 F.2d 792, 793 (9th Cir. 1971).

"[2]*Kirsch* vs. *United States,* supra, quoting from *Boudin* vs. *Lykes Bros. SS Co.,* 349 U.S. 336, 340, 75 S.Ct. 382, 285 [*sic*], 99 L.ed. 354 (1955).

"[3]*Boorus* v. *West Coast Trans-Ocean Steamship Line,* 299 F.2d 893, 896 (9th Cir. 1962), citing *Boudin, supra.*

"[4]*Kirsch* vs. *United States,* supra, citing *Boorus* vs. *West Coast Trans-Oceanic SS Line,* 299 F.2d 893 (9th Cir. 1962).

"[5]*Boudin, supra,* 338-339.

"[6]*Walters* vs. *Moore-McCormack Lines, Inc.,* 309 F.2d 191 at 193 (2nd Cir. 1962) pet. dn. 312 F.2d 893 (2d Cir. 1962).

"[7]*Jones* vs. *Lykes Bros. Steamship Co., supra,* 204 F.2d at 817.

"[8]*Hildebrand* v. *SS Commander,* 247 F.Supp. 625 to 628 (E.D. Va. 1965)."

Plaintiff complains that the instruction was "argumentative, negatory and prolix." Defendant counters by pointing out that every phrase of the instruction is more or less bodily lifted from one of the authorities cited in support thereof.

The fact that a jury instruction is copied from an appellate opinion unfortunately is no guarantee that it is not argumentative, negatory or prolix. The danger of translating appellate rhetoric into jury instructions has received frequent judicial recognition.[9]

Undoubtedly, orthodox adherence to our way of instructing juries would have called for a toning down of some of the breezier language so faithfully copied by defendant. Unfortunate, too, is the fact that, for reasons we find hard to understand the complained of instruction was given before the series of instructions on the general law of unseaworthiness copied earlier in this opinion.[10] Yet, we find it hard to quarrel with the desire of the court to give the jury some guidance on the distinction between a seaman who simply gets into a brawl and one whose nature is such that his mere presence on the ship makes the vessel unseaworthy. Having in mind that the question was given within the framework of an admittedly correct charge on unseaworthiness, we are simply not persuaded that the nature of the court's error was anything but cosmetic.

Plaintiff next complains of a brief instruction which followed the one we have just discussed: "In determining whether the ship was unseaworthy, one important factor you should consider is the custom and practice in the industry. If the ship was staffed and operated in the customary industry manner, and there is no showing of unreasonable risk or danger, than you must find the ship was seaworthy."

---

[9] See, for example, the cases cited in *Fibreboard Paper Products Corp.* v. *East Bay Union of Machinists,* 227 Cal.App.2d 675, 718 [39 Cal.Rptr. 64]. Indeed, plaintiff relies heavily on that case. While the principle of *Fibreboard* is undoubtedly correct, it should be noted that the court merely held that it was not error to refuse instructions patterned on "snippets from . . . [appellate] opinions." Similarly, *Foss* v. *Oliver J. Olson & Co.,* 250 Cal.App.2d 44, 48-50 [58 Cal.Rptr. 511], is not in point. There the unsuccessful defendant based its claim of error on the trial court's failure to give several instructions roughly similar to the type which the defendant here successfully persuaded the court to give.

[10] The court did, of course, instruct the jury as suggested in BAJI No. 1.01. "If in these instructions any rule, direction or idea is repeated or stated in varying ways, no emphasis thereon is intended by me and none must be inferred by you. For that reason you are not to single out any certain sentence or any individual point or instruction and ignore the others, but you are to consider all the instructions as a whole and are to regard each in the light of all the others.

"*The order in which the instructions are given has no significance as to their relative importance.*" (Italics added.)

Undoubtedly, a lawyer can find fault with the instruction. Thus, plaintiff's counsel complain that the record contained no evidence concerning the "custom and practice in the industry" with respect to the staffing of ships. Further, the use of the words "unreasonable risk or danger" conjures up visions of negligence. Finally, any instruction which concludes with a formula—". . . then you must find the ship was seaworthy."—invites disaster.

At the same time, however, we fail to see how the jury was misled to plaintiff's prejudice. If there was no evidence of custom and practice, the effect of the instruction was nil.[11] A lay jury is not likely to think in terms of fault simply because the word "unreasonable" is used by the court, particularly where, as here, it is instructed that negligence, fault, and prior knowledge by the defendant are irrelevant. The only conceivable interpretation which the jury gave to the word "unreasonable" is the entirely proper one: that it indicated the dividing line between a seaman who just happens to get into a fight and one who did so because of propensities which make the vessel unseaworthy. Viewed in that light, the instruction was, at worst, unnecessary.

Plaintiff complains that the court instructed the jury as follows: "You are instructed that the law imposes upon the plaintiff the duty to exercise reasonable care for his own safety. This duty was constant and continuous and remained with him at all times.

"In determining whether the plaintiff exercised reasonable care for his own safety you should ascertain whether plaintiff was aware or should have been aware of danger at the pace and in the manner described by the testimony."[12]

Plaintiff argues correctly that the instruction is misleading in that it equates actual or constructive awareness of danger with lack of rea-

---

[11]It would be different if there were any evidence that the custom in the industry was to hire pugnacious bullies.

[12]There is a slight conflict concerning the exact wording of the instruction between the clerk's transcript, which we have copied in the text, and the reporter's transcript, according to which the court charged: "You are instructed that the law imposes upon the plaintiff to exercise reasonable care for his own safety. This duty was constant and continuous and remained with him at all times. In determining whether the plaintiff exercised reasonable care for his own safety, you should ascertain whether plaintiff was aware or should have been aware of danger at the place and in the manner described by the testimony."

Apparently, the court either did not read, or the reporter did not catch, the words "the duty" in the first sentence of the instruction as requested. We are unable to ascribe any legal significance to this disparity.

sonable care. If that were the law, a seaman would be negligent for going to sea.

If contributory negligence were a complete defense in this case, the instruction would be troublesome indeed. The jury was, however, correctly instructed that only if plaintiff's own negligence was the sole proximate cause of his injury, would he be barred from recovering and that, otherwise, contributory negligence merely affected the amount of damages. Thus, even if the jury was misled into finding plaintiff to have been negligent, the vedict awarding him nothing at all indicates conclusively that the error is immaterial: if the jury obeyed the court's instructions, as we must assume, it could not have returned its verdict without having found in defendant's favor on the issue of unseaworthiness. That finding makes any error on the issue of contributory negligence academic.

■ Finally, plaintiff complains of the following instruction: "Although a seaman never assumes the risk of injury from any unseaworthiness of the vessel, it is a fact of common knowledge that, in almost every occupation aboard ship, there is some inherent and unavoidable risk, *which does not arise out of unseaworthiness*. A seaman, when he enters upon his calling, must assume all inherent and unavoidable risks of his occupation as all persons must; and no person may recover for injuries resulting solely from such inherent and unavoidable risks." (Italics added.)

Plaintiff claims that this instruction was argumentative in favor of defendant's position. The issue, he argues, was simply whether or not the nature of the assault on him was such as to indicate unseaworthiness of the vessel; the instruction is merely another way of saying that if his assailant's temperament was not such as to make the ship unseaworthy, defendant was not liable.

It must be conceded that the jury knew as much about the relevant law before the instruction was given as it did afterwards.[13] Yet a similar instruction was specifically approved in *Temblador* v. *Hamburg-American Lines* (9th Cir. 1966) 368 F.2d 365, and it is hard to say where plaintiff suffered prejudice.[14] To the extent that it informed the jury that plaintiff

---

[13] It should be noted that although the instruction speaks of seamen assuming certain risks, it definitely did not suggest that, if applicable, it defined an affirmative defense, in whole or in part.

[14] *Temblador* was an unseaworthiness claim asserted by a longshoreman. Alleged error predicated on a similar instruction was dealt with as follows: "Appellant properly does not challenge the legal accuracy of this instruction. [Citations.] He specifies it as error because, he argues, it is inapplicable to the present case. He is correct in

assumed the inherent and unavoidable risks of his calling, it stated a legal truism. Insofar as the jury interpreted its generalities to apply to the narrow issue before it, it could hardly—in view of the specific instructions given—have been misled into thinking that a vicious bully did not make plaintiff's ship unseaworthy, after all.

Plaintiff compares this instruction with the instruction on "unavoidable accident" which had been customarily given in this state before the Supreme Court put a stop to the practice in *Butigan* v. *Yellow Cab Co.,* 49 Cal.2d 652, 657-660 [320 P.2d 500]. Assuming the analogy to be apt, plaintiff is not aided thereby. In *Butigan* itself the Supreme Court recognized that the prejudicial effect of the condemned instruction would have to be assessed on a case-by-case basis. (*Ibid.* pp. 660-661.) Thus, it refused to find reversible error when the outlawed instruction had been given in *Guerra* v. *Handlery Hotels, Inc.,* 53 Cal.2d 266, 273 [1 Cal.Rptr. 330, 347 P.2d 674]. (See also *Pobor* v. *Western Pac. R. R. Co.,* 55 Cal. 2d 314, 322 [11 Cal.Rptr. 106, 359 P.2d 474].)

The case was fully and fairly tried. The jury was correctly instructed on the basic theory of liability on which plaintiff pinned his hopes of recovery. There was a profound conflict in the evidence, the resolution of which clearly presented the main task to which the jury devoted its labors. We cannot persuade ourselves that the minor defects in the court's charge affected the result. (See Cal. Const., art VI, § 13.)

The judgment is affirmed.

Stephens, J., and Ashby, J., concurred.

A petition for a rehearing was denied July 12, 1974, and appellant's petition for a hearing by the Supreme Court was denied August 28, 1974.

---

saying that a longshoreman does not assume the risk of unseaworthiness. [Citation.] The instruction, however, does not charge that there was any such assumption. It deals only with a risk 'which does not arise out of unseaworthiness.' The instruction clearly stated, 'a longshoreman does not assume the risk of injury from negligence of another, or unseaworthiness of the vessel or its appliances.' . . .

"Whether or not this instruction was necessary to the case we need not decide. To sustain his assertion that it was reversible error, appellant makes a statement that it was prejudicial. From the tenor of his argument, we deduce that appellant claims that the jury was induced into thinking that the appellant had assumed the risk of unseaworthiness. Such a position is untenable, however, because the instruction plainly stated the contrary." (*Temblador* v. *Hamburg-American Lines, supra,* 368 F.2d at p. 368.)